**The UPJOHN COMPANY, Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**Court No. 81–8–01015.**

United States Court of International Trade.

Nov. 27, 1985.

Donohue & Donohue (Joseph F. Donohue, Jr., Margaret R. Polito and Charles E. Duross, New York City, of counsel) for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., Washington D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office Kenneth N. Wolf, New York City, for defendant.

### Memorandum Opinion and Order

DiCARLO, Judge:

Plaintiff brings this action pursuant to 28 U.S.C. § 1581(a) challenging defendant's classification of a single entry of chemicals under item 403.90 of the Tariff Schedules of the United States (TSUS), as "[m]ixtures in whole or in part of any of the products

provided for in [Subpart B]."[1] Plaintiff claims that the chemical is properly classified under item 800.00 TSUS, as American goods returned. The Court finds that the merchandise is a product of the Netherlands, and was properly classified under item 403.90, TSUS.

## FACTS

The facts of this case as stipulated by the parties are as follows:

1. Plaintiff, the Upjohn Company (hereinafter "Upjohn"), manufactured at its plant in LaPorte, Texas, a chemical described by Upjohn for internal purposes as crude 390 HOP, which is also known generally in the trade as polymethylene polyphenyl isocyanate, and also as polymeric MDI. For purposes of convenience, this material will be referred to throughout this stipulation as crude 390 HOP.

2. The crude 390 HOP was exported from the United States to the Netherlands.

3. Upjohn produced the crude 390 HOP in the following manner: aniline was reacted with formaldehyde to form polymethylene polydiphenyl polyamine. The polymethylene polydiphenyl polyamine was reacted with phosgene to produce the crude 390 HOP, which contains isocyanate functional groups.

4. Isocyanates are reactive chemical compounds, each composed of a nitrogen atom bonded to a carbon atom bonded to an oxygen atom, hereinafter referred to as an –NCO group. Crude 390 HOP is a mixture of compounds of different molecular weights containing isocyanate groups. These compounds are: diphenylmethane diisocyanate, also known as methylene diphenyl diisocyanate (hereinafter referred to as "pure MDI"), triisocyanate, and other isocyanates of higher molecular weight, commonly referred to as "higher molecular weight structures." The lightest of these isocyanates is the pure MDI. The pure MDI molecule consists of 2 benzene rings joined together. Each ring contains one NCO (isocyanate) group [see Attachment A].[2] The triisocyanate molecule consists of 3 benzene rings joined together, with each ring containing one NCO group [see Attachment B]. The higher molecular weight structures consist of 4 or more benzene rings joined together, with each ring containing one NCO group [see Attachment C].

5. The crude 390 HOP described in paragraph 1 was sold by plaintiff to an affiliate, Upjohn Polymer B.V. (hereinafter "Upjohn B.V."), in an intercompany sale for $.1962 per lb. and was exported to the Netherlands. The merchandise was described on the commercial invoice as "Crude 390 HOP (Polymethylene Polyphenylisocyanate)."

6. The exported crude 390 HOP was a mixture consisting of approximately 68.8 percent pure MDI, 13.1 percent triisocyanate and 18.1 percent higher molecular weight structures.

7. The exported crude 390 HOP was subjected to a treatment in the Netherlands by Upjohn B.V. by which heat was applied at low pressure causing a portion of the MDI contained in the crude 390 HOP to vaporize and separate from the remainder of the material. This process, known as evaporation, occurred in a vessel known as a thin film evaporator. The MDI which was thus separated exited through a duct at the top of the thin film evaporator. No changes in molecular structure resulted from this process.

8. The material that remained following separation exited through the bottom of the thin film evaporator, was cooled and sent to storage. It was a mixture of approximately 34.4 percent pure MDI, 26.1

---

1. Subpart B of Schedule 4, part 1 of the tariff schedules describes "Industrial Organic Chemicals." This Subpart was amended by section 223 of the Trade Agreements Act of 1979, Pub.L. No. 96–39, 93 Stat. 144 (1979). Mixtures of products described in Subpart B are currently provided for under item 407.09, TSUS.

2. The attachments referred to throughout the statement of stipulated facts are not reproduced in this opinion.

percent triisocyanate, and 39.5 percent higher molecular weight structures.

9. The pure MDI which was separated and exited the top of the thin film evaporator was immediately subjected to a series of processes which further purified it.

10. The material described in paragraph 8 that remained is sometimes described by Upjohn for internal purposes as crude BLD. It is known generally in the trade as polymethylene polyphenyl isocyanate and as polymeric MDI. For purposes of convenience, this material will be referred to throughout this stipulation as crude BLD.

11. The crude BLD was sold by Upjohn B.V. to Upjohn Company (Plaintiff) for $.1962 per lb., exported from the Netherlands and is the subject of this case. It was described on the commercial invoice as "Crude BLD (Polymethylene Polyphenylisocyanate)."

12. The properties of the crude 390 HOP, the pure MDI and the crude BLD are set forth on Schedule "A" attached hereto.[3]

13. The components of the crude 390 HOP and crude BLD are the same, namely: pure MDI, triisocyanate, and higher molecular weight structures. The relative proportion of triisocyanate and higher molecular weight structures in the crude BLD following separation of a portion of the pure MDI from the crude 390 HOP increased in direct proportion to the amount of pure MDI removed from the crude 390 HOP. The remaining pure MDI in the crude BLD decreased in direct proportion to the amount of pure MDI removed from the crude 390 HOP.

14. The crude BLD remaining after the process described in paragraph 7, following storage as described in paragraph 8, was returned to the United States and blended by Upjohn with other polymeric MDI. The resulting products were known by the Upjohn tradename PAPI. These products were combined with polyols [a chemical group having a chain-like molecule containing an available group composed of one oxygen atom and one hydrogen atom] and

**3.** Schedule "A," attached to the Stipulation, states as follows:

### SCHEDULE "A"

| Property | Crude 390 HOP exported from U.S. | Pure MDI | Crude BLD Imported into U.S. |
|---|---|---|---|
| Isocyanate Equivalent (IE) | 133.7 | 125.1 | 141.5 |
| Acidity, % as HCl | .065 | .003 | .13 |
| Chloride, % Hydrolyzable | .08 | .003 | .14 |
| Chloride, % Total Hydrolyzable | .27 | .010 | .56 |
| Viscosity, cps @ 25 C. | 35 | 25 | 1143 |
| Pure MDI, % | 68.8 | 100 | 34.4 |
| Triisocyanate, % | 13.1 | 0 | 26.1 |
| Higher molecular structures, % | 18.1 | 0 | 39.5 |
| Specific gravity | 1.2 | 1.2 | 1.2 |
| Color * | brown | colorless | brown |
| UV, % T, 500 nm | 73 | 100 | 65 |
| UV, % T, 400 nm | 26.5 | 100 | 11 |
| Form | liquid | liquid | liquid |
| Flashpoint | 435 | 375 | 425 |

* The UV values indicate that the imported Crude BLD is darker in color than the exported Crude 390 HOP as a result of the removal of the pure MDI which is clear in color.

additives to make types of polyurethane which are used to manufacture a variety of products that include furniture, adhesives/sealants, automotive interior trim, foundry core binders, laminated panel cores, insulation, structural foam, refrigeration insulation, particleboard binder, carpet underlay/adhesives and packaging.

15. The pure MDI resulting from the process described in paragraph 7, after further processing as described in paragraph 9, was mixed with other ingredients by Upjohn B.V. to produce products bearing the tradename ISONATE. (These products were not exported to the United States.) ISONATE products are combined with polyols and additives to manufacture types of polyurethane (which are different than those referred to in paragraph 14) which are used to produce a vareity of products such as plastic automotive bumper/fascia, fenders, integral skin plastics, adhesives/sealants, solid tires, shoe soles, roller skate wheels, industrial wheel/rollers, elastic fibers, carpet underlay/adhesives ski boots, and mechanical goods.

16. The polyurethanes described in paragraphs 14 and 15 depend on the presence of the NCO group. The variations in the types of polyurethanes may depend on the chemical structure of the polyols, additives and catalysts which react with the NCO group as well as the isocyanates used.

17. 390 HOP can be, and sometimes is, used as a blending material to produce certain PAPI products of the type referred to in paragraph 14. Such use depends on Upjohn's production needs.

18. The BLD remaining after the separation/evaporation process described in paragraph 7, plus the pure MDI following separation and further processing described in paragraph 9, were more valuable than the exported 390 HOP at the time of exportation. The remaining BLD did not increase in value as a result of the removal of the pure MDI.

19. The crude 390 HOP exported from the United States underwent a change in condition in the Netherlands as a result of the separation of a portion of the pure MDI. This caused the crude BLD to have a more viscous condition, i.e. a thicker consistency, after removal of a portion of the pure MDI. This change in condition is reflected on Schedule "A" in the property described as "Viscosity, CPS @ 25 C°." This change was a physical, not a chemical, change.

20. The crude BLD differs from the crude 390 HOP in isocyanate equivalents, and percentages of pure MDI, triisocyanate and higher molecular weight structures, as listed on Schedule "A".

21. The change in condition which occurred in the Netherlands is also reflected in the property described as "Isocyanate Equivalent (IE)" on Schedule "A". The isocyanate equivalent refers to the average of the equivalent weights of the different molecules present in a given mixture or compound. Pure MDI has an IE of 125 and crude 390 HOP has an IE above 125, due to the presence of the higher molecular weight structures. The removal of a portion of pure MDI (having an IE of 125) results in a greater percentage of molecules of higher equivalent weight in the mass of remaining crude BLD. Since IE reflects an *average* of the equivalent weights in the compound, the mixture following removal of the MDI has a higher equivalent weight, and therefore a higher IE, than the crude 390 HOP prior to removal of the pure MDI. The different isocyanate equivalents are shown on Schedule "A": 133.7 for the crude 390 HOP prior to separation of the pure MDI and 141.5 for the crude BLD after separation of the pure MDI. The change in IE is directly attributable to the separation of the pure MDI.

22. In a drawback statement dated June 4, 1975 (included herein as Attachment D), Upjohn sought amendment of its drawback rate embodied in T.D. 71–201–J which covers PAPI's manufactured with the use of aniline oil. In the statement, Upjohn stated:

"PAPI (Polymethylene Polyphenylisocyanate) is the group name for several similar, but not exact products listed below:

PAPI
Crude 390 HOP
Crude BLD
PAPI 135

These products are different in chemical properties but not chemical structure."

Plaintiff agrees that Attachment D was filed but does not concede that the document is relevant.

23. By the statements in Attachment D that the products are different in chemical properties and are similar, but not exact products, Upjohn was referring to the fact that each product differed in the amounts of MDI, triisocyanate and higher molecular weight structures present therein. These differences were caused by the use of different quantities of aniline to produce each product. The original application filed by Upjohn for drawback on PAPI dated April 1, 1970, to which the amendment of June 4, 1975 relates, is attached to this stipulation as Attachment E.

## DISCUSSION

█ Item 800.00, TSUS, provides for free entry of "[p]roducts of the United States when returned after having been exported, without having been advanced in value or improved in condition by any process of manufacture or other means while abroad." Whether the merchandise is classifiable under item 800.00, TSUS depends upon whether the imported crude BLD is a manufacture of the United States, and if so, whether the product was advanced in value or improved in condition while in the Netherlands.

"The first question to be determined is whether the imported merchandise is the merchandise that was exported. If it was the same, advance in value and improvement in condition are of importance; if it was not the same, value and condition are inconsequential...." *Shell Oil Co. Canada, Ltd. v. United States*, 27 CCPA 94, 98, C.A.D. 68 (1939); *see Burgess Battery*

*Co. v. United States*, 13 Cust.Ct. 37, 48, C.D. 866 (1944).

Exported American products retain their identity as American products, provided they are not transformed into new products while abroad. "[S]uch articles might thereafter be imported [duty free] though *changed in condition*, provided, however, they were not *advanced* in value or *improved* in condition." *United States v. Tower & Sons*, 9 Ct.Cust.Appls. 135, T.D. 37981 (1919) (emphasis in original).

The question whether the crude BLD is a product of the United States depends upon whether it underwent a process of manufacture in the Netherlands which transformed the product into a new article of commerce. In *Anheuser-Busch Brewing Ass'n v. United States*, 207 U.S. 556, 28 S.Ct. 204, 52 L.Ed. 336 (1908), the Court stated:

Manufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor, and manipulation. But something more is necessary, ... There must be transformation; a new and different article must emerge, "having a distinctive name, character, or use."

*Id.* at 562, 28 S.Ct. at 206 (quoting *Hartranft v. Wiegmann*, 121 U.S. 609, 7 S.Ct. 1240, 30 L.Ed. 1012 (1887)).

█ Plaintiff contends that "while the product in this case changed in condition, as a result of the operations in the Netherlands, it did not so change in name, character or use as to become a new product...."[4] The Court disagrees, and for the reasons that follow finds that the processing which occurred in the Netherlands resulted in a change in the character of the merchandise.

Plaintiff argues that the facts in this case are similar to those in two decisions which held that residues of exported American goods were entitled to duty free treatment. In *United States v. Rubelli's Sons*, 8 Ct.Cust.Apls. 399, T.D. 37645 (1918), duty-free treatment was accorded to hard

---

**4.** Brief for Plaintiff at 11.

spelter which previously was exported to Canada in the form of soft spelter for use in galvanizing iron pipe. The soft spelter was brought to a molten form and iron pipes were immersed. The immersion produced some crystallization of the melted zinc, and the crystallized particles fell to the bottom of the tank, bringing with them a percentage of the impurities picked up from the pipes. The crystalized zinc particles deposited at the bottom of the tank were drawn off into molds, redistilled of impurities and imported as hard zinc spelter. *Id.* at 400.

The second case relied upon by plaintiff is *United States v. Tower & Sons,* 9 Ct. Cust.Apls. 135, in which the Court described the following process:

> Tungstic acid, produced in the United States, was exported to Canada in the condition of an impalpable yellow powder. The purpose of the exportation was to use the article in the manufacture of tungston wire for incandescent lamp fillings. The processes applied in Canada are several. It is first dissolved in ammonia and the resultant insoluble materials filtered out. This rejected material is called "insoluble residue" and consists of small lumps of clay-like material said to contain tungston, lime, and other impurities.

*Id.* at 135–36.

The *Tower* Court held that the question whether the insoluble residue was entitled to duty-free entry was controlled by *Rubelli's Sons, supra:*

> The process of production therefore of hard from soft spelter was but a process of segregation or elimination. So here the process of producing this "insoluble residue" is but a process of segregation or elimination, and the cases do not seem to be distinguishable. No new article of manufacture is produced.

*Tower,* at 137.

A critical distinction, articulated by the Court of Customs and Patent Appeals in *Shell Oil Co. of Canada, Ltd. v. United States,* 27 CCPA 94, C.A.D. 68 (1939), distinguishes the present case from those cited by plaintiff. In *Shell,* American crude petroleum was exported to Canada, where it underwent a "cracking process," by which gasoline was extracted from the crude. The residue, invoiced as "Cracking still residue," was imported into the United States, and duty free treatment was denied by Customs and the trial and appellate courts. *Id.,* 27 CCPA at 95. The court held that the processing of the crude "resulted in new and distinctive articles—one being gasoline; the other being oil." *Id.,* 27 CCPA at 100.

With respect to the plaintiff's contention that the merchandise was entitled to duty free entry under the reasoning in the *Rubelli's Sons* and *Tower* cases, the court stated:

> An essential difference, it seems to us, lies in the fact that the hard spelter involved in the *Rubelli's Sons et. al.* case *supra,* and the "insoluble residue" of tungstic acid of the *Tower & Sons* case, *supra,* did not result from the processing of the materials from which they were derived for the purpose of changing the character or form of any element of the basic material, or for separating one element from another. The soft spelter exported was not processed to separate it into parts, as was the crude petroleum here, nor was the tungstic acid. The basic materials involved in those cases were applied immediately and directly to the manufacture of certain merchandise entirely different in character, and the respective residues of zinc and tungstic acid were not new articles.
>
> In the instant case the crude petroleum was not applied to the making or finishing of extraneous manufactures, but was itself, and by itself, processed in a manner which resulted in new and distinctive articles—one being gasoline; the other being oil.

27 CCPA at 100.

In *Tower* and *Rubelli's Sons,* the materials were not sent abroad in order to separate one part of the materials from the rest. No process was performed for the purpose of changing the exported materi-

als. Rather, the returned goods were residues of materials which were exported in order to process other substances.

In contrast, the *Shell* crude petroleum was subjected to a separation process. The appellate court held that the purposeful separation resulted in the creation of new articles which were not entitled to duty free treatment when subsequently imported into the United States. As in *Shell*, the merchandise in this case was purposefully separated into two distinct products, crude BLD and pure MDI. The change in character which resulted from the separation is evidenced by the differences between the crude 390 HOP and crude BLD in numerous respects, including viscosity, isocyanate equivalents, and relative percentages of pure MDI, triisocyanate and isocyanates of higher molecular weight.

A further consideration also leads the Court to conclude that this case is controlled by *Shell*. In that opinion the court stated:

> Appellant's primary object doubtless was to obtain the element known as gasoline, but in the very process of obtaining this element there was also obtained the merchandise involved. That the gasoline *per se* was a resultant of the process and that it was something distinct from the material exported seems clear, and to us it seems equally clear that the residue occupies the same status. The mere fact that it was not the primary article which appellant desired and that, in a sense, it was "unwanted" does not affect its *per se* status as an article resulting from a process of manufacture in Canada, nor does the fact its production was an unavoidable result of the process used in obtaining the particular article primarily desired affect that status.

27 CCPA at 98.

The Court finds that plaintiff's purpose in exporting the crude 390 HOP was to extract pure MDI from the crude 390 HOP. The Court also finds the pure MDI to be a new article of commerce. Through the evaporation process, by which plaintiff obtained the pure MDI, plaintiff also obtained

the crude BLD. Under the reasoning of *Shell*, the crude BLD occupies the same status as the pure MDI—that of a new and different product.

Plaintiff attempts to distinguish *Shell* in four respects. First, it argues that petroleum is a crude product of nature, whereas the exported chemical mixture is a manufactured product. This distinction, however, was specifically rejected as a controlling consideration in *Shell*:

> One distinction between the imported materials involved in those cases and the imported material at bar is that the former were obtained from articles which had been manufactured in the United States, while the material here was obtained from a product which was exported in its natural state. That difference alone, however, would not be controlling because paragraph 1615, *supra*, is not confined to manufactures, or even to articles derived from manufactures, exported from the United States, but embraces also the crudest of materials which are of United States origin.

27 CCPA at 100.

Second, plaintiff argues that gasoline and heating oil are both finished products, whereas crude BLD must be blended to produce a marketable product. Nothing in *Shell* states or even suggests that the imported product was denied duty free status because the imported merchandise was a final product. Since finished and non-finished products are not accorded different treatment in the tariff provisions in issue, the Court finds this distinction immaterial to whether the crude BLD is a returned American product.

A third distinction raised is that the exported and imported products in *Shell* could not be used interchangeably, whereas crude 390 HOP is sometimes used in a manner similar to crude BLD. Under the reasoning stated in *Shell*, a residue from a separation process which yields a new article of commerce is likewise newly manufactured merchandise. 27 CCPA at 98. Since the Court finds that the pure MDI is a new article of commerce, and that the crude

BLD resulted from the separation process performed upon the 390 HOP in the Netherlands, any similarity in the potential uses of the exported product and the imported residue is irrelevant under the *Shell* principle.

Finally, plaintiff points out that the "cracking" process applied to the crude petroleum in *Shell* is a process which breaks the molecular bonds of heavy hydrocarbons such as petroleum. Plaintiff argues that since the evaporation process caused no molecular changes, the resultant separation effected only a change in the condition of the merchandise, and therefore the residual crude BLD was not a newly manufactured product.

The Court finds no reason to believe that the appellate court intended to limit the applicability of *Shell* only to situations in which processing results in the breaking of molecular bonds. The Court holds that *Shell* is controlling where, as in the case at bar, the exported substance was subjected to a process of evaporation which separated a portion of the exported substance and effected a change in the character of the residual substance.

The crude BLD, like the extracted pure MDI, is an article of commerce different from crude 390 HOP. Since the character of the exported product was altered by the evaporation process, the crude BLD is not a product of the United States, but a manufacture of the Netherlands. Since the imported merchandise is not the same as that which was exported, it is not necessary for the Court to consider the value or condition of the merchandise. *Shell*, 27 CCPA at 98; *Burgess Battery Co. v. United States*, 13 Cust.Ct. 37, 48, C.D. 866 (1944).

## CONCLUSION

Plaintiff has failed to demonstrate that the government's classification is incorrect, and the Court affirms the classification of the entry under item 403.90, TSUS. Judgment will be entered accordingly.