**AMERICAN NTN BEARING MANUFAC-TURING CORP., Plaintiff,**

v.

**UNITED STATES, United States Department of Commerce, and Robert Mosbacher, Secretary of Commerce, Defendants,**

**and**

**The Timken Company, Defendant–Intervenor.**

**Court No. 89–06–00338.**

United States Court of International Trade.

May 22, 1990.

Barnes, Richardson and Colburn, Robert E. Burke, Donald J. Unger, Jesse M. Gerson, Chicago, Ill., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., Jane E. Meehan, Philadelphia, Pa., for defendants.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., John M. Breen, Washington, D.C., for defendant-intervenor.

## OPINION

MUSGRAVE, Judge.

Plaintiff challenges the legality of a scope clarification issued by the International Trade Administration concerning an antidumping duty order covering tapered roller bearings and parts thereof, finished or unfinished, from Japan.

**Held:** The ITA scope clarification was appropriate and in accordance with law; plaintiff's action is dismissed.

In this action, plaintiff American NTN Bearing Manufacturing Corporation (hereinafter "ANBM") challenges the legality of a scope clarification issued by the International Trade Administration of the U.S. Department of Commerce ("ITA"). This clarification concerned the scope of an antidumping duty order covering tapered roller bearings ("TRBs") and parts thereof, finished or unfinished, from Japan. *See* 52 Fed.Reg. 37352 (October 6, 1987), *amended,* 52 Fed.Reg. 47955 (December 17, 1987). Plaintiff claims the scope clarification was unsupported by substantial evidence in the administrative record and was otherwise not in accordance with the law. Oral argument was held at the Court on April 25, 1990.

## BACKGROUND

In 1987, ITA issued an antidumping duty order covering TRBs and parts thereof, finished or unfinished, from Japan, after finding that those products were being sold at less than fair value ("LTFV") in the U.S. market, *see* 52 Fed.Reg. 30700 (August 17, 1987), and after a subsequent unanimous

determination by the U.S. International Trade Commission ("ITC") that an industry in the U.S. was being materially injured by reason of imports of those TRBs and parts thereof. *See Tapered Roller Bearings and Parts Thereof, and Certain Housings Incorporating Tapered Rollers from Japan,* USITC Pub. 2020, Inv. No. 731–TA–343 (Final), Record Document ("R. Doc.") 4 (September 1987), 52 Fed.Reg. 36847 (October 1, 1987).

On May 23, 1988, counsel for ANBM submitted a letter to ITA requesting confirmation that certain imported parts of TRBs (specifically, green machined, or "turned," rings that had not been heat treated during the manufacturing process) were not included within the scope of the antidumping duty order. After soliciting comments upon the requested scope clarification from the interested parties, ITA responded on May 17, 1989, having determined that green turned rings were within the order's purview. *See* Scope Memorandum, R. Doc. 12.

This action followed, with jurisdiction having properly been invoked pursuant to 28 U.S.C. § 1581(c).

## DISCUSSION

■■ As with any motion for summary judgment on the agency record, this Court must grant considerable deference to the agency findings of record and may not substitute its judgment for that of the agency's. The evidence supporting the agency's determination need merely fall within what a "reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co., et al. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Matsushita Electric Industrial Co., Ltd., et al. v. United States,* 750 F.2d 927, 933 (Fed.Cir.1984).

■ The "substantial evidence" standard used by the Court to evaluate whether the agency's findings are supported by law contemplates "essentially a limited review of the agency determination, insuring that the agency conclusions are reasonably drawn from some evidence, more than a mere scintilla, in light of the record as a whole." *Alhambra Foundry, et al. v. United States,* 9 CIT 632, 635, 626 F.Supp. 402, 407 (1985).

This limited standard of review should not imply, however, that the agency's findings are absolute, for to so hold would render this Court's function meaningless. The Court's overview is necessary to modify, from time to time, "ITA's overly sweeping view of the authority it is granted" to administer the antidumping laws of the United States. *Olympic Adhesives, Inc. v. United States,* 899 F.2d 1565, 1571–72 (Fed.Cir.1990).

With these standards in mind, the Court must decide whether ITA's scope clarification that green turned rings which have not been heat treated are within the scope of the antidumping duty order covering TRBs and parts thereof, finished and unfinished, from Japan, is supported by substantial evidence in the record and was otherwise in accordance with the law. This broad issue encompasses several sub-issues:

1.) Whether the product description in the petition, investigations and determinations of ITA and ITC was ambiguous;

2.) If the record is ambiguous, whether ITA may use the criteria outlined in *Diversified Products Corp. v. United States,* 6 CIT 155, 572 F.Supp. 883 (1983) to ascertain whether a preexisting product is covered by an antidumping duty order; and

3.) If ITA may resort to the *Diversified* analysis, whether the agency's application of the *Diversified* factors was reasonable and supported by substantial evidence of record?

### 1.) *Product Description*

■ It is well established that ITA has the authority to clarify and define the scope of an antidumping duty order. *Gold Star Co., Ltd., et al. v. United States,* 12 CIT ——, 692 F.Supp. 1382 (1988), *aff'd sub nom. Samsung Electronics Co., Ltd. v. United States,* 873 F.2d 1427 (Fed.Cir. 1989). In delineating which products fall within the scope of that order, ITA may

consider the petition, the preliminary and final determinations of LTFV and material injury investigations by ITA and ITC, respectively, any previous ITA notices (*i.e.,* notice of initiation of the LTFV investigation), and available ITC publications.[1]

■ The dispute in this action centers on TRBs, which are machine components used to permit free motion between moving and fixed parts by guiding or moving the parts to minimize friction and wear. *Tapered Roller Bearings and Parts Thereof, and Certain Housings Incorporating Tapered Rollers From Italy and Yugoslavia,* USITC Pub. 1999, Inv. Nos. 731–TA–342 and 346 (Final), R. Doc. 2 (August 1987) at A–3. Four basic parts comprise a TRB: the cone, the tapered rollers, the roller retainer or cage, and the cup. *Id.* at A–4.

The following descriptions of the product subject to the antidumping duty order are contained in the record:

... all tapered roller bearings, tapered rollers and other parts thereof (both finished and unfinished) including, but not limited to, single-row, multiple-row (e.g., two-, four-), and thrust bearings and self-contained bearing packages (generally pre-set, pre-sealed and pre-greased), but only to the extent that such merchandise is not presently covered by an outstanding dumping finding in the United States.[2] Antidumping Duty Petition (August 25, 1986), R.Doc. 1 at 5, 7.

... imports of tapered roller bearings 0–4 inches in outside diameter from NTN; imports of all tapered roller bearing sets, cone assemblies, and cups greater than 4 inches in outside diameter; imports of tapered rollers and all other bearing parts; and unfinished tapered roller bearing components [not covered by an outstanding antidumping duty order or finding]. R.Doc. 12 at 2.

... tapered roller bearings and parts thereof, currently classified under Tariff Schedules of the United States (TSUS) item numbers 680.30 and 680.39; flange, take-up cartridge, and hangar units incorporating tapered roller bearings, currently classified under TSUS item number 681.10; and tapered roller housings (except pillow blocks) incorporating tapered rollers, with or without spindles, whether or not for automotive use, and currently classified under TSUS item 692.32 or elsewhere in the TSUS. *Preliminary Determination of Sales at Less Than Fair Value,* 52 Fed.Reg. 9905, 9906 (March 27, 1987); *Final Determination of Sales at Less Than Fair Value,* 52 Fed.Reg. at 30700; *Antidumping Duty Order,* 52 Fed.Reg. at 37352.

In addition to these product descriptions, the ITC staff report in a related investigation described in detail the four manufacturing stages of TRBs: (1) green machining, or "turning," (2) heat treating, (3) finishing, including grinding and polishing/honing, and (4) assembly. R.Doc. 2, A–8 through A–11.[3] The report also con-

---

**1.** It is interesting to note that in the Omnibus Trade and Competitiveness Act of 1988 (which amended the trade laws to provide for, *inter alia,* anticircumvention measures), Congress added section 781(e) of the Tariff Act, under which ITC is authorized to give advice to ITA in making its scope determinations under all of the anticircumvention provisions except minor alterations. S.Rep. No. 71, 100th Cong., 1st Sess. 100, 101 (1987). *See also* Bello, Holmer and Tillman, *Anticircumvention Measures: Shifting the Gears of the Antidumping and Countervailing Duty Laws?,* 24 Int'l Law. 207, 213 (1990).

Had Congress wished to expand this statutory advisory role for ITC to the context of ITA scope *clarifications,* at issue here, it could have so provided in the 1988 amendments, but did not do so. Thus, the authority of ITA, and ITA

alone, to clarify scope determinations appears to be absolute.

**2.** This reference was to T.D. 76–227, *see* 41 Fed. Reg. 34974 (August 18, 1976), which covered TRB's and certain components from Japan. The Secretary of the Treasury (at that time responsible for administering the antidumping laws) clarified the meaning of "TRB's" to include "inner race or cone assemblies and outer races or cups, either sold as a unit or separately." *Id.* at 34975.

**3.** The Final Determination by ITC in this case explicitly incorporated by reference the staff report "product information findings" in the related investigation concerning the process used to manufacture TRB's. *See* R.Doc. 4 at 5, n. 6.

tained a description of "unfinished bearing components;" those being "the cones, cups and rollers that have been green machined and *heat treated* . . . but that require final finishing." *Id.* at A–8 (emphasis supplied).[4] Upon this latter definition alone hinges plaintiff's claim.

Because every other determination lacked any explicit reference to green turned rings that have not been heat treated, plaintiff claims this definition is controlling, and mandates a finding by this Court that green turned rings, that is, cups or cones that have undergone the first of the four manufacturing stages, but have not progressed beyond that stage because they have not been hardened by heat treatment, are not subject to the antidumping order. Plaintiff asserts that green turned rings which have not been heat treated are not within the ITC's definition of "unfinished" parts (those that are green machined *and* heat treated); an "unfinished" TRB part is claimed to be one upon which only finishing and assembly remain yet to be performed. At any point in the manufacturing process *prior* to that stage, claims ANBM, the product has not become an "unfinished" part. Plaintiff therefore urges this Court to find that green turned rings that have not been heat treated are neither finished nor unfinished parts of TRBs and are exempted from the scope of the order.

Moreover, because the subject product was specifically referenced in the ITC staff report, ANBM claims that no ambiguity existed as to the scope of the order, which therefore precluded ITA from examining the factors set forth in *Diversified Products Corp. v. United States,* 6 CIT 155, 572 F.Supp. 883 (1983) to resolve the question of whether a product falls within the scope of an ambiguous order.[5]

In opposition, the government claims that neither the petition nor any of the relevant determinations by ITA and ITC explicitly referred to green turned rings that are not heat treated. Because of this ambiguity, it is argued that ITA was justified in resorting to the *Diversified* analysis to clarify the scope of the order.

Defendant–Intervenor (the Timken Company, or "Timken"), however, takes the position that the "product definition" contained in the ITC staff report constitutes only one of many elements of the record that ITA may consider in clarifying the scope of an order; more important, it claims, is the petition. As the petitioner in this action, intervenor stresses that its intention, from the very onset of the investigation, was to include *all* TRBs, rollers and parts, whether finished or not, within the scope of the investigation. Because the petition very clearly evinced petitioner's intent to include all TRBs, rollers and parts, whether finished or not, intervenor argues no ambiguity in the record exists, and that ITA was therefore not required to utilize the *Diversified* analysis in making this scope determination.

Alternatively, argues intervenor, the evidence favoring inclusion of all parts (regardless of their state of manufacture) within the order's scope is more than sufficient to support the agency's finding of "ambiguity" and its subsequent application of *Diversified.*

From these competing arguments, the Court must decide whether the relevant sources were ambiguous as to the descrip-

---

**4.** This same definition was utilized by ITC in *Tapered Roller Bearings and Parts Thereof, and Certain Housings Incorporating Tapered Rollers from Hungary, the People's Republic of China and Romania,* USITC Pub. 1983, Inv. Nos. 731–TA–341, 344, and 345 (Final) (June 1987), at A–7 through A–8, and *Tapered Roller Bearings and Parts Thereof, and Certain Housings Incorporating Tapered Rollers from Hungary, Italy, Japan, the People's Republic of China, Romania, and Yugoslavia,* USITC Pub. 1899, Inv. Nos. 731–TA–341 through 346 (Preliminary) (October 1986), at A–6.

**5.** Those factors are: (1) the general physical characteristics of the product, (2) the expectations of the ultimate purchaser, (3) the ultimate use of the merchandise, and (4) the channels of trade through which the product is distributed.

*Kyowa Gas Chemical Industry Co., Ltd. v. United States,* 7 CIT 138, 140, 582 F.Supp. 887, 889 (1984) added a fifth criterion to the *Diversified* analysis, "the manner in which the product is advertised and displayed." However, courts continue to refer to the *"four*-part" *Diversified* analysis.

**1560**

tion of the product subject to the antidumping duty order.

As a preliminary matter, plaintiff attaches too much importance to the passage in the ITC staff report. This definition appeared in the section of the related staff report entitled "the Product," and sub-titled "Description and uses." R.Doc. 2 at A–3. In *this* staff report, as noted earlier, that product description was incorporated by reference, but was contained in the "like product" discussion. *See* R.Doc. 4 at 4–5.

An ITC "like product" investigation is conducted for a different purpose than the "class or kind" investigation made by ITA. The latter agency determines the "class or kind" of merchandise that is allegedly being sold at LTFV, *see* 19 U.S.C. § 1673a(c)(2) and 1673e(a)(2) (1988), while the former determines whether a U.S. industry producing a "like product" is injured by reason of the dumped (or in the case of a countervailing duty investigation, subsidized) import. *See* 19 U.S.C. § 1677(4)(A) and § 1677(10) (1988).[6] Because the definition relied upon by ANBM appears in the "like product" discussion of the ITC report, its relevance to ITA's scope determination can only be considered minimal.

However, ITA did cite the ITC staff report definition in the Scope Memorandum, R.Doc. 12 at 3. A plain reading of the definition would seemingly limit "unfinished" components to those that have been *both* green machined *and* heat treated, given that the definition uses the conjunctive rather than the disjunctive. This use may have been inadvertent on the part of the ITC staff, but even if it was intentional, the definition would seem to conflict with the clear language of the petition which includes *all* parts of TRBs, finished or unfinished.

Whether the ITC staff report product definition conflicts with the clear language of the petition begs the question of what green turned rings that have not been heat treated *are*, if they are not unfinished parts. As a matter of logic, all parts must be either "finished" or "unfinished." If a part is not "finished," then it must necessarily be "unfinished." If a part is neither finished nor unfinished, then it cannot be a "part" at all, but rather must be a raw material (or scrap metal). Nowhere in its voluminous memoranda does plaintiff address this very practical point.

Little case law directly addresses the issue presented here. Plaintiff does, however, attempt to fashion some arguments from cases involving related issues. Citing *Gold Star*, 692 F.Supp. at 1384, ANBM relies on the Court's holding that "[t]he ITA has the authority to clarify and define the scope of an antidumping determination ... however ... it does not have the authority to change or modify the original determination" to assert that the Scope Memorandum here *changes* and otherwise *modifies* the scope of the antidumping duty order covering TRBs and parts thereof. Absent from this pronouncement is any analysis showing *why* the memorandum here "changes" and "modifies" the order, rather than "clarifies" and "defines" it.

Plaintiff also cites *Gold Star* for the proposition that where the ITC has so refined or specifically defined a term used throughout an investigation, this Court will accept that definition as controlling. However, *Gold Star* makes no such sweeping generalization, nor was the definition on which plaintiff's case rests used "throughout" the investigation involved here. In *Gold Star*, color television receivers, complete or incomplete, from Korea were subject to an antidumping duty order. "An incomplete receiver was characterized in

---

**6.** ITC may determine during the course of its investigation that the class or kind of merchandise defined by ITA as being within the scope of ITA's investigation may consist of more than one like product. ITC can reach this result despite the finding by ITA that only one class or kind of merchandise is covered by ITA's investigation. *See, e.g., Certain Valve, Nozzles, and*

*Connectors of Brass from Italy for Use in Fire Protection Systems,* USITC Pub. 1649, Inv. No. 731–TA–165 (Final) (February 1985) (where ITC found seven like products even though ITA had found only one class of merchandise). This may explain why ITC's "like product" inquiry is seemingly more particularized than ITA's "class or kind" investigation.

the ITC investigations as: 'a color picture tube ["CPT"] and a printed circuit board ["PCB"] or ceramic substrates with components assembled thereon ...'" 692 F.Supp. at 1384. Plaintiff requested clarification from ITA as to whether *separately* imported subassemblies and components such as printed circuit boards and color picture tubes were within the scope of the order. After considering comments which referenced excerpts from documents used by ITA in making its LTFV determination, and by ITC in making its material injury determination, ITA responded affirmatively. Plaintiff challenged that clarification. The Court held that television components and subassemblies were of the class or kind of merchandise properly included within the scope of the order, and affirmed ITA's clarification.[7]

The Court reached its finding based partly upon the definition of "incomplete receivers" found in the ITC determinations. *Id.* at 1385. In that respect, *Gold Star* is factually similar to this case, where the ITC defined "unfinished parts." However, the question of "ambiguity," of primary importance here, was not at issue in the *Gold Star* order.

The Court was concerned by the possibility of plaintiffs' circumventing the order if separate shipments of subassemblies, subsequently assembled together, were allowed to escape the imposition of antidumping duties: "[t]he Court will not allow such a transgression upon the antidumping duty laws of this country." *Id.*

Not only does the present case not involve a "class or kind" challenge, it does not involve subassemblies. This fact lessens *Gold Star's* influence on the outcome of this case, since the basis for that decision was anticircumvention.[8] ("If the Court were to allow separate importations of PCBs and CPTs [subsequently assembled together] to escape the purview of the [antidumping] order, the domestic industry would continue to suffer the injurious consequences of dumped goods." *Id.*) Rather, the issue in this case focuses on what point in the manufacturing process materials become "unfinished parts" subject to the order.

Also cited by plaintiff is *Royal Business Machines, Inc. v. United States*, 1 CIT 80, 507 F.Supp. 1007 (1980), *aff'd*, 69 CCPA 61, 669 F.2d 692 (1982). In that case, the Court was presented with a jurisdictional issue resulting from plaintiff's failure to properly contest the suspension of liquidation of certain portable electric typewriters imported after the imposition of an

7. *Mitsubishi Elec. Corp., et al. v. United States*, 12 CIT ——, 700 F.Supp. 538 (1988), *aff'd*, 898 F.2d 1577 (Consol.) (Fed.Cir.1990) focused on a similar issue: whether discrete subassemblies dedicated exclusively for use in cellular mobile telephones which had a value of $5 or more were included within the scope of an antidumping order covering cellular mobile telephones and subassemblies imported from Japan. The petition in that case specifically noted the domestic industry's desire to prevent Japanese manufacturers from circumventing the order "by creating the facade of manufacturing cellular mobile telephones in the United States; when in fact that 'manufacturing' uses kits ... or mobile transceivers ... that are made in Japan." 700 F.Supp. at 542.

In affirming ITA's scope determination that subassemblies valued at $5 or more *were* within the scope of the order, the Court emphasized that the petitioner had, in the petition and during the investigation, clearly evinced its intent and purpose to include discrete subassemblies within the scope of the investigation, *id.* at 533, for the reasons noted above. Thus, anticircumvention seems to have been the primary factor

behind the Court's decision. While such a factor might play a role here, it does not appear to have been the foremost concern.

8. The pleadings made several arguments concerning anticircumvention. For instance, the government claims that even if green turned rings which have not been heat treated are more "unfinished" than other parts, a finding that those parts are outside the scope of the order cannot follow. Such an artificial distinction, argues defendant, would virtually invite foreign TRB part manufacturers to circumvent the order.

Timken also makes the policy argument that *all* unfinished parts were included within the scope of the investigation because of the concern that third-party manufacturers were evading the 1976 antidumping finding, noted earlier at fn. 2.

However, these arguments, while relevant, would assume more importance if this dispute were an anticircumvention action bought pursuant to 19 U.S.C. § 1677j (1988) (one of the new remedies added by the 1988 amendments to the Tariff Act, *see* discussion at fn. 1.)

antidumping duty order. Rather than file a 28 U.S.C. § 1581(c) action, plaintiff instead requested confirmation from ITA that its imported products had not been included within the scope of the order. Plaintiff felt the order indicated that its imports were not included therein; plaintiff thus maintained it was not aggrieved by any final agency determination needed to institute judicial review of the order. When ITA determined that plaintiff's imports *were* included within the scope of the order, plaintiff instead filed a § 1581(i) action seeking to enjoin "retroactive" modification of the order.

In its analysis in *Royal,* the Court observed that "[e]ach stage of the statutory proceeding maintains the scope passed on from the previous stage."[9] 507 F.Supp. at 1014. Plaintiff uses this observation as the basis for claiming that at every stage of the administrative proceeding, the investigations did not extend beyond unfinished parts or components, which were defined as green turned rings that have been heat treated. At no stage in the proceedings did petitioner Timken object to the definition.

■ Presumably, ANBM meant to argue that because Timken made no objection to ITC's staff report definition of "unfinished parts" during the investigations, they are foreclosed from objecting at this juncture. The Court cannot accept this proposition. Requiring petitioners to possess the foresight to object to definitions that could possibly include obscure products or thereafter accept those products as excluded from the order would be tantamount to requiring petitioners to specify, by name, the universe of articles that might possibly be covered by the order they seek. Either scenario would be unreasonable and unworkable.

Plaintiff also uses *Royal* to argue that the previous determinations all utilized the ITC's definition, and that since the final order must express the result of the previous determinations without alterations (as noted above; 507 F.Supp. at 1014), the order must be read as not including green turned rings that have not been heat treated. It is clear, however, that the scope passed on from stage to stage during the course of these determinations was simply "parts or components, finished or unfinished." The ITC staff report definition did not appear in this determination until September, 1987, one year after the scope of the investigation was announced. *See* 51 Fed.Reg. at 33286. Thus, that definition cannot have been passed on from the initial stage of the investigation to each succeeding stage if it was not even incorporated until twelve months after the initiation of the investigation.

Finally, plaintiff contends that because green turned rings were specifically excluded from the scope of an antidumping duty investigation in the petition in *Antifriction Bearings—Other than Tapered Roller Bearings—from the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand and the United Kingdom,* 54 Fed.Reg. 18992 (May 3, 1989), the rings are distinguishable from other "unfinished" parts at issue in this case. Since they are distinguishable, green turned rings that have not been heat treated should fall outside the ambit of the order covering unfinished parts, argues ANBM.

To the contrary, defendant asserts that because green turned rings which have not been heat treated were specifically excluded from the underlying petition in the antifriction bearing case, so too could petitioner have requested exclusion of those rings from *this* petition. Because such a request was not made, the government maintains that the rings fall within the order's scope.

Notwithstanding the fact that separate, unrelated antidumping investigations by ITA are irrelevant to these proceedings, the government's point is well-taken. If the petitioner in the antifriction case specifically requested that a particular item be

---

**9.** The Court went on to hold that plaintiff's action was ultimately directed at the basis of the final determinations and not at the final order, and plaintiff should have brought an action under 28 U.S.C. § 1581(c). 507 F.Supp. at 1015. Because plaintiff failed to commence its action within the statutory 30–day period, the Court was without jurisdiction to hear the claim. *Id.*

exempted from the scope of those investigations, then the petitioner in this case (Timken) could have likewise made a specific request that green turned rings which have not been heat treated be excluded from the antidumping investigations.[10]

However, as noted earlier, requiring petitioners (as well as ITA) to specify, by name, the entire range of articles which are or may be in the future excluded from the coverage of an investigation might present an impossible task.

Defendant-intervenor makes a persuasive case for absence of ambiguity based upon its contention that from the filing of its initial petition to the present litigation, all parts, in every stage of production, were included in the investigation and orders. The Court finds, however, that the ITC staff report language defining unfinished parts as those which have been heat treated varies from the language of the petition.

In addition, plaintiff itself requested clarification from the governmental authorities concerning the scope of the order. Had the order been unambiguous, as plaintiff maintains, recourse to a clarification request would not have been necessary.

Thus, ambiguity does arise, and the scope determination to clarify this ambiguity was clearly within the discretion and the authority of ITA.

**2.) *Use of Diversified Criteria***

■ Plaintiff maintains that ITA's resort to the factors outlined in *Diversified Products Corp.*, 572 F.Supp. 883,[11] to clarify the scope of the order was not warranted. ANBM asserts that only new products developed *after* an order issues can be sub-

ject to the *Diversified* analysis. Because green turned rings were not new products developed *after* imposition of the order, ANBM claims ITA erred in analyzing the subject merchandise according to the *Diversified* factors.

The government instead claims that ITA can always rely on the *Diversified* factors to determine whether a pre-existing product is covered by an ambiguous antidumping duty order.

Both parties rely on *Floral Trade Council of Davis, California v. United States*, 13 CIT ——, 716 F.Supp. 1580 (1989) to support their positions. In that case, the Court upheld ITA's determination that daisies were not within the scope of antidumping duty orders covering certain fresh-cut flowers. ITA reached that conclusion primarily because "daisies" were not discussed in the petition as a product to be investigated. *Id.* at 1582.

As secondary reasoning, and "in an effort to be comprehensive, ITA [applied] *the analysis applicable to newly developed products* to this case of any existing product." *Id.* (Emphasis supplied.) While finding this reasoning unnecessary (because the agency could have relied exclusively on the product description in the petition to reach the same result), the Court held that ITA's application of the *Diversified* criteria was nonetheless supported by evidence in the record. *Id.*[12]

The government acknowledges that while ITA ordinarily utilizes *Diversified* to determine whether a *new* product is within the class or kind of merchandise covered by the order, *see Kyowa Gas Chemical Industry Co., Ltd. v. United States*, 7 CIT 138, 582 F.Supp. 887 (1984), it argues that ITA

---

**10.** The significance of this point may be lessened by the fact that the petitioner in the antifriction bearing case, the Torrington Company, had interests antithetic to those of petitioner-intervenor here. Timken produces bearing-grade steel, which it uses to manufacture TRB's. Torrington, however, does not possess steel-making capacity and must purchase bearing-grade steel from domestic and foreign sources. Thus, as parties with divergent concerns, the two companies could hardly be expected to draft their petitions in precisely the same terms, even if the product at issue is the same.

**11.** For the purposes of this case, *Diversified* merely established the factors ITA may consider in clarifying the scope of an antidumping duty order.

**12.** The Court also noted, in a footnote, that "[t]his type of analysis may be of use to ITA in making scope determinations regarding pre-existing products, especially if ITA is attempting to interpret an ambiguous petition." 716 F.Supp. at 1582, n. 3.

may also apply the four criteria when the agency finds ambiguity in the record as to whether the pre-existing product was covered by the antidumping duty order.

Plaintiff relies on language contained in ITA's statement before the United States–Canada Free Trade Agreement Binational Review Panel to counter the government's arguments. ITA, it is argued, explicitly limited its use of the *Diversified* criteria to situations involving new products: "[f]or purposes of clarifying pre-existing orders, the case [*Diversified*] is limited to situations involving new products." Brief of the Investigating Authority, Review No. USA–89–1904–02, August 29, 1989, at 11–12.

However, that statement also contains a proviso that *Diversified*, for purposes of interpreting pre-existing findings and orders, is *normally* limited to cases involving new products. *Id.* at 13. Thus, ITA did not rule out using the *Diversified* analysis in other limited circumstances. It would seem, then, that ITA recognizes that the chief applicability of *Diversified* lies with newly developed products, but in cases where the record contains an ambiguous product description, it may also be useful to apply that analysis as well.

Plaintiff further cites the reference in ITA's statement before the U.S.–Canada Free Trade Agreement Binational Review Panel to the recent legislation codifying the *Diversified* criteria, *see* 19 U.S.C. § 1677j(d)(1) (1988):[13] "the amendment is explicitly limited to merchandise developed after an order is issued." Brief of the Investigating Authority at 32, emphasis in original. However, in that same para-graph, ITA also notes that "[t]he recent legislation codifying the *Diversified* criteria ... confirms that they are *primarily* suited to determining whether new products are within the scope of an outstanding antidumping duty order ..." *Id.* (Emphasis added.) This passage does not indicate that the criteria apply *exclusively* to newly developed products; it merely stresses this is their *primary* use.

In addition, as defendant-intervenor properly notes, the Conference Report accompanying the legislation codifying the *Diversified* factors, Section 1321(d), Pub.L. 100–418, 102 Stat. 1192, indicates that none of that section's provisions were intended to call into question the past authority of ITA to make scope determinations. *See* S.Rep. No. 576, 100th Cong., 2nd Sess. 601 (1988). Thus, the legislative history indicates that the amendment was not intended to fore-close ITA from applying *Diversified* in conformity with its past practices. The amendment arose only to provide ITA with a statutory mechanism for clarifying whether later-developed merchandise is covered by an existing antidumping duty order, since apparently the great majority of past applications had sought to remedy that specific problem. The amendment does not, however, foreclose ITA from invoking *Diversified* in similar, but not exactly analogous, situations.

Based on this legislative history and the decision in *Floral Trade*, the Court cannot adopt the position advanced by plaintiff that *Diversified* applies *only* to new products developed after an antidumping duty order issues. Such an inflexible standard,

---

13. **(d) Later-developed merchandise**
    **(1) In general**
    For purposes of determining whether merchandise developed after an investigation is initiated under this subtitle or section 1303 of this title (hereafter in this paragraph referred to as the "later-developed merchandise") is within the scope of an outstanding antidumping or countervailing duty order issued under this subtitle or section 1303 of this title as a result of such investigation, the administering authority shall consider whether—
    (A) the later-developed merchandise has the same general physical characteristics as the merchandise with respect to which the order was originally issued (hereafter in this paragraph referred to as the "earlier product"),
    (B) the expectations of the ultimate purchasers of the later-developed merchandise are the same as for the earlier product,
    (C) the ultimate use of the earlier product and the later-developed merchandise are the same,
    (D) the later-developed merchandise is sold through the same channels of trade as the earlier product, and
    (E) the later-developed merchandise is advertised and displayed in a manner similar to the earlier product.

while producing a bright line to aid in litigation of the complex issues embedded in the antidumping laws, might also have the effect of unjustly precluding viable claims.

The Court notes that past practice supports defendant's argument that *Diversified* can be used to clarify the scope of an antidumping duty order as it applies to preexisting products, when the order and its accompanying administrative record are ambiguous. The Court therefore holds that while the use of *Diversified* may be beneficial to ITA in clarifying the scope of an ambiguous order, the agency is not required to apply the *Diversified* factors to a preexisting product, nor was ITA necessarily constrained to utilize the *Diversified* analysis here. Where the order is ambiguous, ITA may resort to whatever criteria it determines will resolve the ambiguity. If the agency chooses to apply the *Diversified* factors, as ITA did here, that application is a legitimate exercise of the discretion and authority of ITA.

### 3.) *Application of Diversified Criteria*

■ Because ITA was justified in applying the four *Diversified* criteria to clarify the ambiguous order, the Court must ascertain whether ITA's application was reasonable and supported by substantial evidence of record. In analyzing these criteria, it should be noted that ITC found neither finished nor unfinished parts or components have any other commercial use other than as parts of TRBs. R.Doc. 2 at A–8; R.Doc. 4 at 6.

Additionally, ITC noted that while each step of the production process of a TRB is necessary (i.e., green machining and heat treatment), importing the product prior to a certain stage in the manufacturing process does not alter the ultimate use of the part or component being manufactured or finished. R.Doc. 4 at 7.

### a. *General Physical Characteristics*

Applying the first of the *Diversified* criteria, ITA noted that "the general physical characteristics of a green turned ring are similar to an unfinished part ..." R.Doc. 12 at 3. Plaintiff disputes this finding, arguing that green turned rings do not share the same general physical characteristics as unfinished parts because they have not been heat treated. This heat treatment effects a significant change in the physical properties of green turned rings, claims ANBM, thus distinguishing them from unfinished parts.

Plaintiff relies on *Ferrostaal Metals Corp. v. United States*, 11 CIT 470, 664 F.Supp. 535 (1987) to advance the proposition that heat treatment effects a "substantial transformation" of materials on which it is performed, thus necessitating a finding that green turned rings which have not been heat treated possess significantly different physical characteristics than unfinished parts, which are further along in the manufacturing process.

*Ferrostaal* concerned cold rolled steel sheet which was subjected to a particular heating process called "annealing." From this lone factual similarity (the metallurgical effects of the heat treatment process) plaintiff seeks to extrapolate the Court's reasoning to the circumstances of this case. However, a customs case involving the controlled heating and cooling of steel sheet in a furnace cannot easily be reconciled with an antidumping case involving green turned rings that have not been heat treated.

As *Ferrostaal* noted, the concept of "substantial transformation" is used for identifying the country of origin of imported merchandise for purposes of determining the dutiable status of that merchandise. 664 F.Supp. at 537. The term is of primary importance in cases involving country of origin markings, *see, e.g., Nat'l Juice Products Ass'n v. United States*, 10 CIT 48, 628 F.Supp. 978 (1986), and cases involving American goods returned, *see, e.g., Upjohn Co. v. United States*, 9 CIT 600, 623 F.Supp. 1281 (1985). In the context of determining the scope of an antidumping duty order, "substantial transformation" has little legal significance.

Thus, ITA's finding that the general physical characteristics of a green turned ring are similar to those of an unfinished part is supported by substantial evidence in

the record and was otherwise in accordance with the law.

b. *Expectations of the Ultimate Purchaser*

ITA held that the expectations of the ultimate purchaser concerning green turned rings do not differ from those of the ultimate purchaser of unfinished or finished parts of TRBs because green turned rings are intended to be components of finished TRBs. R.Doc. 12 at 3. The Scope Memorandum also referenced ITC's finding that only a very small residual market exists for unfinished components.[14] R.Doc. 12 at 3.

Given that green turned rings which have not been heat treated have no alternative use other than as parts of TRBs, and that the negligible residual market for unfinished components is the same as for finished components (both markets consisting of TRB producers), plaintiff's argument that the expectations of the ultimate purchaser of green turned rings are different from those of purchasers of unfinished parts cannot be supported by the facts. The expectations of the ultimate purchaser are the same for green turned rings and all other components; they are expected to function as part of a complete bearing unit after all necessary manufacturing and assembly operations are performed.

Accordingly, ITA's determination that the expectations of the ultimate purchasers concerning green turned rings do not differ from those of the ultimate purchasers of TRB parts and components, both unfinished and finished, is supported by substantial evidence in the record and was otherwise in accordance with the law.

c.) *Use* and d.) *Channels of Distribution*

ITA found that "the ultimate use of the green turned ring is almost exclusively as a component of a tapered roller bearing,"[15]

R.Doc. 12 at 4, and that "the green machined ring [which has not been heat treated] moves through the same channel of trade as either an unfinished component or a completed TRB." *Id.*

ANBM's only challenge to this finding rests on their assertion that the expectations of the ultimate purchasers are different; "consequently, the *use* and *channels of distribution* of non-heat treated green machined rings are different from those of heat treated green turned rings." Plaintiff's Memo at 39.

However, as noted above, the premise for this argument cannot be sustained by the findings of record, since the expectations of the ultimate purchasers for green turned rings and the expectations of the ultimate purchasers for finished and unfinished TRB parts are the same. Therefore, ANBM's position on these two points cannot be upheld. ITA's findings regarding the use and channels of distribution of green turned rings is supported by substantial evidence in the record and was otherwise in accordance with the law.

CONCLUSION

ITA's clarification of the scope determination covering TRBs and parts thereof, finished and unfinished, from Japan, is supported by substantial evidence in the record and was otherwise in accordance with the law.

ORDER

This action having been duly submitted for decision, and the Court, after due deliberation, having rendered a decision herein; now, therefore, in conformity with said decision it is hereby

ORDERED, ADJUDGED AND DECREED that plaintiff's motion for judgment upon the agency record is denied; and it is further

---

14. This market was found to be "very small" and "not significant," consisting of "tapered roller bearing producers who finish the components into complete bearings or who purchase to alleviate short-term material shortages." R.Doc. 4 at 28, n. 2 (additional views of Vice-Chairman Brunsdale).

15. The "negligible residual market" noted earlier presumably prevented ITA from categorically finding that green turned rings had *no* other use than as a TRB component.

ORDERED, ADJUDGED AND DE-CREED that this action be and the same hereby is dismissed.