**KOYO SEIKO CO., LTD. and Koyo Corporation of U.S.A., Plaintiffs,**

v.

**The UNITED STATES and The United States Department of Commerce, Defendants,**

**The Timken Company, Defendant–Intervenor.**

Slip Op. 97–14.
Court No. 95–03–00236.

United States Court of International Trade.

Feb. 4, 1997.

Powell, Goldstein, Frazer & Murphy (Peter O. Suchman, Richard M. Belanger, Niall P. Meagher and Todd Friedbacher), Washington, DC, for Plaintiffs Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Jeanne E. Davidson, Assistant Director, and Laurel A. Loomis ) of counsel: Kira Alvarez, Attorney–Advisor, Office of the Chief Counsel for Import Administration, Department of Commerce, Washington, DC, for Defendants.

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr. and Olufemi A. Areo-

la), Washington, DC, for Defendant-Intervenor The Timken Company.

## *OPINION*

TSOUCALAS, Senior Judge:

Plaintiffs, Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. (collectively "Koyo"), challenge the Department of Commerce, International Trade Administration's ("Commerce") determination that certain rough forgings imported by Koyo are within the scope of the antidumping duty order, entitled *Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan ("1987 TRB Order")*, 52 Fed.Reg. 37,352 (Oct. 6, 1987). *See Final Affirmative Determination in Scope Inquiry on Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof From Japan ("1995 Koyo Scope Ruling")*, 60 Fed.Reg. 6519 (Feb. 2, 1995).

### *Background*

Based upon a petition filed by The Timken Company ("Timken"), the Department of the Treasury [1] issued an antidumping finding covering tapered roller bearings ("TRBs"), four inches or less in outside diameter, that were exported from Japan and sold in the United States. *See Tapered Roller Bearings and Certain Components From Japan ("1976 TRB Finding")*, 41 Fed.Reg. 34,974 (Aug. 18, 1976).

In 1981, due to confusion over the size and degree of completion of TRBs covered by the 1976 TRB Finding, Commerce issued a scope clarification, *Tapered Roller Bearings and Certain Components Thereof From Japan; Clarification of Scope of Antidumping Find-*ing *("1981 Scope Clarification")*, 46 Fed. Reg. 40,550 (Aug. 10, 1981).

Timken subsequently filed another petition alleging that TRB sales were being made at less than fair value ("LTFV"). *See Antidumping Duty Petition: Tapered Roller Bearings, Rollers and Other Parts From Japan, Italy, Yugoslavia, Romania, Hungary, The People's Republic of China ("1986 Timken Petition")* (Aug. 25, 1986), P.R. Doc. No. 10, Ex. 1, Def.-Int.'s App. The 1986 Timken Petition sought an antidumping duty order to cover all TRBs and parts thereof, finished or unfinished, not covered by the scope of the 1976 TRB Finding. *See id.* at 7. Pursuant to an investigation, Commerce determined that these products were being sold at LTFV and issued an antidumping duty order covering their entry. *See 1987 TRB Order*, 52 Fed.Reg. at 37,352–53.

In 1989, Commerce issued a scope ruling in response to a request submitted in 1988 by another Japanese bearing manufacturer, American NTN Bearing Manufacturing Corporation ("ANTN"). ANTN's request concerned the status of rings that have been green machined or turned on a lathe, but not heat treated. In an unpublished scope ruling, Commerce determined under a *Diversified Products* analysis [2] that ANTN's rings were unfinished parts and therefore included within the scope of the 1987 TRB Order. *Memorandum from Richard Moreland on Scope Request on Green Turned Rings to Joseph A. Spetrini ("1989 ANTN Scope Ruling")* (May 16, 1989), Pls.' App., Ex. 2.

In each of the first three administrative reviews of the 1987 TRB Order (the 1987/88, 1988/89 and 1989/90 reviews), Koyo stated in its questionnaire responses to Commerce

---

1. The Department of Treasury was responsible for administering the antidumping law until 1979, when this responsibility was transferred to Commerce.

2. A revised version of 19 C.F.R. § 353.29(i) (1994) (*Other Scope Determinations*), was promulgated in 1990 to incorporate the factors set forth in *Diversified Prods. Corp. v. United States*, 6 CIT 155, 572 F.Supp. 883 (1983). The section states, in relevant part:

[I]n considering whether a particular product is within the class or kind of merchandise described in an existing order, the Secretary will take into account the following:
 (1) The descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary and the Commission.
 (2) When the above criteria are not dispositive, the Secretary will further consider:
 (i) The physical characteristics of the product;
 (ii) The expectations of the ultimate purchasers;
 (iii) The ultimate use of the product; and
 (iv) The channels of trade.

that it was importing forged rings, and that it considered these forged rings to be outside the scope of the 1987 TRB Order. *See, e.g., Koyo's Section A Questionnaire Response for the 1988/89 Administrative Review* (Aug. 3, 1990), Pls.' App., Ex. 3, at 13–14.

In July 1993, during the course of a review of the antidumping duty order covering the period of 1990–91, Timken submitted information to Commerce concerning certain Koyo forged rings, including tower forgings, hot forgings and cold forgings (collectively "forgings"), that were not being included in the scope of the 1987 TRB Order because they were being classified as iron or steel forgings under subheading 7326.19 of the Harmonized Tariff Schedule of the United States ("HTSUS"). Thereafter, Koyo was instructed to classify the forgings as TRB parts under HTSUS 8482.99 and to deposit estimated antidumping duties.

This instruction precipitated Koyo's request on September 17, 1993 for a scope ruling regarding the 1987 TRB Order. *See Request for Clarification as to the Scope of the Antidumping Duty Order on Tapered Roller Bearings from Japan ("1993 Koyo Scope Request")* (Sept. 17, 1993), P.R. Doc. No. 1, Pls.' Jt.App., Ex. 1. Specifically, Koyo requested that Commerce confirm that Koyo's forgings are not within the scope of the 1987 TRB Order. *See id.*

Commerce subsequently published a preliminary determination that Koyo's forgings constituted unfinished parts within the scope of the 1987 TRB Order. *See Preliminary Affirmative Determination of Scope Inquiry on Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof From Japan,* 59 Fed.Reg. 9471 (Feb. 28, 1994). Pursuant to the preliminary determination, Commerce received comments from interested parties and held a public hearing pursuant to 19 C.F.R. § 353.29(d)(3) (1994).

On February 2, 1995, Commerce issued its final determination, concluding that Koyo's forgings are within the 1987 TRB Order. *See generally 1995 Koyo Scope Ruling.* Koyo contests Commerce's 1995 Koyo Scope Ruling. Oral argument was held at the Court on May 1, 1996.

### Discussion

The Court has jurisdiction over this matter under 19 U.S.C. § 1516a(a)(2) (1994) and 28 U.S.C. § 1581(c) (1994).

■ The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir.1990).

Forgings are the basic material used by Koyo to produce TRBs and are the products at issue in this case. *See* Koyo's Mem. Supp. Mot. J. Agency R. at 8. Koyo's forgings are made from bearing-grade steel bars, which are cut to create a slug, extruded into the shape of a ring, and pierced to make a bore. *Id.* at 8. Once they are formed into the rough shape needed to produce TRBs, these forgings are exported by Koyo to its U.S. subsidiary, American Koyo Bearing Manufacturing Corporation ("AKBMC"), where they are further processed. *Id.* AKBMC turns the forgings on a series of lathes in a process called "green machining" to create "green rings." *Id.* Between 24 and 30 percent of the weight of the original forging is removed as waste during this process. *Id.* The rings are then marked with a part number, heat treated and subjected to further processing (e.g., grinding, polishing and assembling) to make a finished TRB part. *Id.* at 8–9.

■ The sole issue presented before this Court is whether Commerce's 1995 Koyo Scope Ruling, which concluded that certain Koyo forging imports are within the scope of the 1987 TRB Order, is supported by sub-

stantial evidence on the record. Commerce is given considerable deference in its authority to define the scope of an antidumping duty investigation. *See, e.g., Sundstrand Corp. v. United States,* 19 CIT ——, ——, 890 F.Supp. 1100, 1103 (1995).

■ In determining whether a particular product is within the scope of an antidumping duty order, Commerce must first consider whether the underlying petition covers the product. 19 C.F.R. § 353.29(i); *see also Torrington Co. v. United States,* 16 CIT 99, 104, 786 F.Supp. 1021, 1025 (1992). If the petition is ambiguous, Commerce must then examine the preliminary and final determinations of LTFV by the International Trade Administration ("ITA") and material injury by the International Trade Commission ("ITC"), any previous ITA notices of initiation of the LTFV investigation and any available ITC publications. *See* 19 C.F.R. § 353.29(i); *see also Koyo Seiko Co. v. United States,* 17 CIT 1076, 1079, 834 F.Supp. 1401, 1403–04 (1993); *Nitta Indus. Corp. v. United States,* 16 CIT 244, 1992 WL 78429 (1992), *aff'd,* 997 F.2d 1459 (Fed.Cir.1993); *American NTN Bearing Mfg. Corp. v. United States,* 14 CIT 320, 322, 739 F.Supp. 1555, 1557–58 (1990). If the scope of the particular product is still unclear, Commerce is to look to other criteria, including an analysis of the product's character under the factors enumerated in *Diversified Products. See* 19 C.F.R. § 353.29(i); *see also Torrington,* 16 CIT at 104, 786 F.Supp. at 1025. The application of the *Diversified Products* criteria is not required for the resolution of the ambiguity but is a legitimate exercise of Commerce's discretion and authority. *American NTN,* 14 CIT at 331, 739 F.Supp. at 1565.

1. *Commerce's Decision to Conduct a Diversified Products Analysis*

 a. **The 1986 Timken Petition**

 ■ Pursuant to the test set forth by the regulations and case law, Commerce first examined the 1986 Timken Petition to determine whether Koyo's forgings fall within the scope of the 1987 TRB Order. *1995 Koyo Scope Ruling,* 60 Fed.Reg. at 6519–20. In such a scope investigation, where Commerce examines the description of the merchandise contained in the petition, Commerce must give ample deference to the intent of the petitioner. *Koyo Seiko,* 17 CIT at 1078, 834 F.Supp. at 1403; *Torrington,* 16 CIT at 105, 786 F.Supp. at 1026. The 1986 Timken Petition included the following merchandise:

 all tapered roller bearings, tapered rollers and other parts thereof (both finished and unfinished) including, but not limited to, single-row, multiple-row (e.g., two-, four-), and thrust bearings and self-contained bearing packages (generally pre-set, presealed and pre-greased), but only to the extent that such merchandise is not presently covered by an outstanding antidumping duty order or finding in the United States.

*1986 Timken Petition,* at 7. Commerce determined that the language of the 1986 Timken Petition was "not sufficiently clear . . . to be used as a basis for making a scope determination in this case." *1995 Koyo Scope Ruling,* 60 Fed.Reg. at 6519–20.

Koyo asks the Court to reject Commerce's determination, stressing that the 1986 Timken Petition clearly intended to exclude forgings from the scope of the definition of "unfinished parts." Koyo's Mem. Supp. Mot. J. Agency R. at 17. First, Koyo notes that, while the 1986 Timken Petition failed to include any reference to rough forged rings, the language "not presently covered" indicates that it intended, in part, to remedy the effect of the 1981 Scope Clarification by addressing the exclusion of unfinished parts from the 1976 TRB Order. *Id.* at 17–18 (citing *1995 Koyo Scope Ruling,* 60 Fed.Reg. at 6519). Koyo argues that because the 1986 Timken Petition failed to provide any definition for unfinished parts of TRBs, it must have incorporated the unfinished parts definition of the 1981 Scope Clarification. *Id.* at 18–19. The 1981 Scope Clarification defined unfinished parts as "cups, cones, and retainers that have been forged and rough machined; that is, turned on a lathe only," 46 Fed.Reg. at 40,551, and held that unfinished parts were not subject to the 1976 TRB Finding. Hence, Koyo contends that its forgings, which are not machined, do not fall under the 1981 Scope Clarification's defini-

tion of unfinished parts, which the 1986 Timken Petition incorporated. *Id.* at 18.

Further, Koyo asserts that Timken, in effect, adopted the 1981 Scope Clarification definition of unfinished parts, even before its 1986 petition, by failing to object to that definition when it was published. Koyo's Mem. Supp. Mot. J. Agency R. at 18–19.

Commerce responds that the *American NTN* court sustained a finding by Commerce that the language of the 1986 Timken Petition was ambiguous with respect to the definition of the term unfinished parts and affirmed Commerce's use of the *Diversified Products* analysis. Def.'s Opp'n to Mot. J. Agency R. at 9. Commerce further notes that the 1986 Timken Petition was intended to broaden the scope of the existing TRB order, and not to exclude Koyo's forgings. *Id.* at 11–12.

Timken agrees generally with Commerce's position that the 1986 Timken Petition intended to encompass Koyo's forgings at issue here. *See* Timken's Opp'n to Mot. J. Agency R. at 14–17.

■ The Court concludes that the 1986 Timken Petition is ambiguous with respect to the meaning and scope of the term unfinished parts. In *American NTN*, this Court found that the 1986 Timken Petition term unfinished parts was ambiguous with respect to whether green machined rings that have not been heat treated were within the definition of unfinished parts because the petition failed to explicitly refer to green turned rings that have not been heat treated.[3] *See* 14 CIT at 329, 739 F.Supp. at 1563. While Koyo's forgings in this case were not green machined *or* heat treated, the rationale of *American NTN* remains applicable: the 1986 Timken Petition is ambiguous because it fails to explicitly refer to forged rings that have not been machined.

Further, there is no indication that the 1986 Timken Petition intended to adopt, or adopted, the definition for unfinished parts as stated in the 1981 Scope Clarification. The 1981 Scope Clarification addressed two aspects of the 1976 TRB Finding, concluding that: (1) only TRBs four inches or less in outside diameter were included in the 1976 TRB Finding; and (2) the 1976 TRB Finding did not apply to unfinished parts of TRBs. *See 1981 Scope Clarification,* 46 Fed.Reg. at 40,550–51. The 1981 Scope Clarification simply described specific TRB types that were not covered by the 1976 TRB Order; it did *not* provide a definition of unfinished parts that is relevant to Timken's 1986 petition.

Koyo's argument that Timken may not object to the definition of unfinished parts contained in the 1981 Scope Clarification because Timken failed to immediately provide an alternative definition must also be rejected. ANTN made a similar argument in *American NTN*, contending that Timken was foreclosed from objecting to the ITC report's definition of unfinished parts because Timken failed to proffer an alternative definition, or otherwise object to the ITC's definition. *See* 14 CIT at 327–28, 739 F.Supp. at 1562. The court disagreed, stating that

> [r]equiring petitioners to possess the foresight to object to definitions that could possibly include obscure products or thereafter accept those products as excluded from the order would be tantamount to requiring petitioners to specify, by name, the universe of articles that might possibly be covered by the order they seek. Either scenario would be unreasonable and unworkable.

*Id.* Similarly, in this case, it would be unreasonable to assume that Timken adopted the 1981 Scope Clarification definition of unfinished parts by failing to both object to the

---

**3.** In *American NTN*, 14 CIT at 327–28, 739 F.Supp. at 1562, ANTN argued that green turned rings that have not been heat treated were not within the scope of the 1987 TRB Order. ANTN relied on an ITC staff report that contained a description of " 'unfinished bearing components;' those being 'the cones, cups and rollers that have been green machined and *heat treated* ... but that require final finishing.' " *Id.* at 323, 739

F.Supp. at 1559 (citation omitted). Commerce examined the 1986 Timken Petition and determined that it was ambiguous because it did not explicitly refer to green turned rings that are not heat treated. *Id.* at 327–28, 739 F.Supp. at 1562. The court then held that the ITC staff report language defining unfinished parts varied from the language of the 1986 Timken Petition. *American NTN*, 14 CIT at 329, 739 F.Supp. at 1563.

ITC's definition and advance an opposing definition.[4]

Finally, it is clear that Timken requested broad protection for TRBs and TRB parts: "this petition alleges LTFV sales of *all imported TRBs and parts thereof* not covered by the existing [1976] antidumping duty order." *1986 Timken Petition,* P.R. Doc. 10, Ex. 1, at 16, Def.-Int.'s App. (emphasis added). Thus, the Court cannot accept Koyo's assertion that Timken intended to narrow the focus of its petition by excluding forgings such as Koyo's.

Consequently, there is sufficient evidence on the record to support Commerce's conclusion that the 1986 Timken Petition was not sufficiently clear to form the basis of a scope determination.

### b. The 1987 TRB Order

■ Where the petition is ambiguous in a scope investigation, Commerce must rely on other evidence. *See* 19 C.F.R. § 353.29(i)(1). Thus, Commerce next examined the 1987 TRB Order. The scope of the 1987 TRB Order was defined in the following way:

> The products covered by this investigation are *tapered roller bearings and parts thereof, currently classified under Tariff Schedules of the United States (TSUS) item numbers 680.30 and 680.39;* flange, take-up cartridge, and hanger units incorporating tapered roller bearings, currently classified under *TSUS* item number 681.10; and tapered roller housings (except pillow blocks) incorporation tapered rollers, with or without spindles, whether or not for automotive use, and currently classified under *TSUS* item 692.32 *or elsewhere in the TSUS.* Products subject to the outstanding antidumping duty order covering certain tapered roller bearings from Japan (T.D. 76–227, 41 FR 34974) are not included within the scope of this investigation.

*Final Determination of Sales at Less Than Fair Value; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan* ("*1987 TRB Order Final Determination* "), 52 Fed.Reg. 30,700, 30,700 (Aug. 17, 1987) (emphases added). To correctly assess the scope of the 1987 TRB Order, Commerce turned to the underlying LTFV and injury investigations. *1995 Koyo Scope Ruling,* 60 Fed.Reg. at 6520–21. Upon consideration of these investigations, Commerce concluded that the language of the 1987 TRB Order, as well as the underlying injury and LTFV investigations, provided no guidance as to whether Koyo's forgings were within its scope. *See id.* at 6520–21.

Koyo claims that the 1987 TRB Order, like the 1986 Timken Petition, fails to define unfinished parts, and so, it must be presumed that the 1987 TRB Order adopted the 1981 Scope Clarification definition. Koyo's Mem. Supp. Mot. J. Agency R. at 21–22.

Further, Koyo claims that the 1987 TRB Order explicitly excluded from its scope articles classified under tariff provisions under which Koyo imported its forgings at the time. *Id.* at 22–28. In particular, the 1987 TRB Order expressly stated that it referred, without any disclaiming language, to tapered roller bearings and parts thereof that were classified at that time under Tariff Schedules of the United States ("TSUS") numbers 680.30 and 680.39. *Id.* at 25. In contrast, with respect to tapered roller housings, Commerce inserted the disclaiming language, "currently classified under *TSUS* item 692.32 *or elsewhere in the TSUS.*" *Id.* at 26 (citing *1987 TRB Order Final Determination,* 52 Fed.Reg. at 30,700 (emphasis added)). At the time, Koyo's forgings were classified under 606.7340 of the TSUS, the *eo nomine* provision for non-machined forgings. Koyo's Mem. Supp. Mot. J. Agency R. at 23–24. Hence, Koyo claims that under the doctrine of *expressio unius est exclusio alterius,*[5] Commerce's decision not to use disclaiming

---

4. Koyo claims that Commerce discerned the hypothetical intent of the 1986 Timken Petition by admitting in the 1995 Koyo Scope Ruling, *see* 60 Fed.Reg. at 6519, that Timken "may have intended" the term unfinished parts to include Koyo's forgings. *See* Koyo's Mem. Supp. Mot. J. Agency R. at 19–20. Such an admission, however, does not preclude Commerce from concluding that the 1986 Timken Petition was ambiguous in this case because it may still be unclear what Timken meant by unfinished parts.

5. "[T]he expression of one thing is the exclusion of another." *Black's Law Dictionary* 521 (5th ed. 1979).

language with respect to the tapered roller bearings must be construed as meaning that merchandise classified under other TSUS headings, such as Koyo's forgings, was not intended to be within the scope of the 1987 TRB Order. *Id.* at 26.

Commerce responds that the 1987 TRB Order, like the 1986 Timken Petition, is ambiguous because it did not define unfinished parts or adopt the 1981 Scope Clarification "definition" of unfinished parts. Def.'s Opp'n to Mot. J. Agency R. at 13–14.

Commerce further responds that its reference to TSUS numbers was also not a definition of unfinished parts, since classification numbers used by Customs are not dispositive of the scope of an antidumping duty order, and Commerce is not bound by Customs's classification determinations on scope issues. *Id.* at 14–15 (citing *Smith Corona Corp. v. United States,* 915 F.2d 683, 686–87 (Fed.Cir. 1990); *Diversified Products,* 6 CIT at 160, 572 F.Supp. at 887). Commerce therefore maintains that the existence of specific TSUS numbers in the 1987 TRB Order does not resolve the existing ambiguity of whether the order applies to Koyo's forgings. Def.'s Opp'n to Mot. J. Agency R. at 15.

Timken insists that the scope of the 1987 TRB Order can only be ascertained by referring to the underlying investigations. Timken's Opp'n to Mot. J. Agency R. at 18. Timken then observes that, throughout the original LTFV and injury investigations underlying the 1987 TRB Order, Koyo considered its forgings to be within the scope of the investigations. *Id.*

Furthermore, Timken contends that the tariff classifications included in the 1987 TRB Order are not binding on Commerce for purposes of interpreting the scope of the 1987 TRB Order for the following reasons. First, in *Royal Bus. Machs. v. United States,* 1 CIT 80, 507 F.Supp. 1007 (1980), *aff'd,* 69 C.C.P.A. 61, 669 F.2d 692 (1982), the court held that, based on the underlying LTFV and injury determinations, the tariff provisions cited in the order at issue were not dispositive of the scope of the order. Timken's Opp'n to Mot. J. Agency R. at 19–20.

Second, Timken asserts that there is no indication that the 1987 TRB Order intended the list of tariff provisions to define its scope. *Id.* at 19–22. Indeed, there is no need for a disclaimer to state the proposition that tariff classification does not control the scope of an antidumping duty order. *Id.* at 21 n. 4. At most, Timken contends, the listing of tariff items in the 1987 TRB Order creates uncertainty regarding imports of potential TRB parts under other classifications. *Id.* at 22. In such circumstances, Timken argues, Commerce appropriately examined the traditional scope factors. *Id.* (citing *Koyo Seiko Co. v. United States,* 17 CIT at 1079, 834 F.Supp. at 1404).

 In determining whether certain goods are within the scope of the final antidumping duty order, the order must be examined with the help of the "antidumping petition, the factual findings and legal conclusions adduced from the administrative investigations, and the preliminary order." *Smith Corona,* 915 F.2d at 685 (citation omitted).

The 1987 TRB Order does not provide a definition for unfinished parts, or refer to the 1981 Scope Clarification or another possible definition. Even though there is no discussion as to the difference between finished parts, unfinished parts and raw materials in the 1987 TRB Order, the list of tariff provisions within the order indicates that, at the time it was issued, Commerce may have intended to define the scope of the order in a way that excluded Koyo's forgings. However, upon considering the 1987 TRB Order in light of the underlying investigations, ambiguity arises over the scope of the order.

 Customs and Timken correctly note that courts have consistently held that customs tariff classifications do not govern antidumping determinations with respect to class or kind. *See, e.g., FAG Kugelfischer Georg Schafer KGaA v. United States,* 20 CIT ——, ——, 932 F.Supp. 315, 320 (1996) (citing *Torrington Co. v. United States,* 14 CIT 507, 512, 745 F.Supp. 718, 722 (1990)). Indeed, "[i]t is the responsibility of ITA to interpret the term class or kind in such a way as to comply with the mandates of the antidumping laws, not the classification statutes." *Torrington,* 14 CIT at 512–13, 745

F.Supp. at 722. Further, classification under the antidumping law need not match the customs classification, as the customs valuation statute and antidumping statute are substantially different in both purpose and operation. *See Smith Corona*, 915 F.2d at 686; *see also Royal Business Machines*, 1 CIT at 87 n. 18, 507 F.Supp. at 1014 n. 18 ("[Customs] may not independently modify, directly or indirectly the [antidumping law] determinations, their underlying facts, or their enforcement.") In fact, determinations under the antidumping law may properly result in the creation of classes that do not correspond to classifications found in the tariff schedules or may define or modify a known classification in a manner not contemplated or desired by Customs. *Royal Business Machines*, 1 CIT at 87 n. 18, 507 F.Supp. at 1014 n. 18.

██ Nevertheless, this case involves a unique and limited situation that the courts have not addressed: an ITA class or kind description using references to tariff classifications *without* a disclaimer for certain merchandise and references to tariff classifications *with* a disclaimer for other merchandise. It is important to note in this analysis that, although Commerce has the authority to clarify the scope of a final antidumping duty order, it may not alter the scope of the order "in a way contrary to its terms." *Id.* at 686.

In *Nitta Industries*, 997 F.2d at 1462, the United States Court of Appeals for the Federal Circuit ("CAFC") held that a reference to a specific tariff classification *may* be merely for administrative convenience or otherwise not intended to be conclusive of the intended scope of the order. In that case, however, the ITA explicitly stated in each of its publications that the "classification numbers [to which it referred] were provided merely for convenience and that the written description of the scope of the investigation was dispositive." *Id.* Hence, the *Nitta Industries* court did not advance an expansive holding encompassing every situation in which the ITA refers to a tariff classification but, rather, narrowly held that the ITA may explicitly limit the breadth of its references to tariff classifications. In this case, as previously mentioned, Commerce failed to provide such a disclaimer for tapered roller bearings and parts thereof.

*Smith Corona* and *Royal Business Machines* involved the same antidumping duty order, which covered portable electric typewriters and referred to TSUS 676.0510, the classification for all portable electric typewriters at the time. *See* 915 F.2d at 686. In *Royal Business Machines*, soon after the publication of the antidumping duty order at issue, Customs determined that a particular typewriter model did not fall under TSUS 676.0510, and so, was outside the scope of the order. 1 CIT at 84, 507 F.Supp. at 1011. When Commerce disagreed with Customs' determination, the court concurred, concluding that Customs has a ministerial role in the antidumping duty law and that, in an antidumping duty proceeding, it is solely Commerce's domain to define the class or kind of merchandise. *Id.* at 87 n. 18, 507 F.Supp. at 1014 n. 18.

This case does not involve a situation in which Customs independently modified a dumping determination; Commerce itself expressly referred to the tariff classification for TRBs without any disclaiming language. Commerce could have clearly indicated any intent to use the TSUS numbers purely for reference purposes, by including disclaiming language (*e.g.*, "or elsewhere in the TSUS"), as it did for TRB housing in the very same order.

In *Smith Corona*, with subsequent advancements in technology, portable typewriters with text memory capability were developed and imported. 915 F.2d at 686. While these advanced typewriters were not classified under TSUS 676.0510, the ITA included them within the scope of the order. *Id.* at 685. The CAFC agreed with the ITA, concluding that the order's reference to a tariff classification was not dispositive of whether the order encompassed a new/modified product for which a tariff classification did not exist at the time of publication. *Id.* at 686.

In contrast, Koyo's forgings at issue here were neither included in the 1987 TRB nor a new/modified product. Rather, they existed at the time the 1987 TRB Order was issued and were classified under TSUS 606.7340, the *eo nomine* provision for nonmachined

forgings, while the 1987 TRB Order explicitly stated that it encompassed "tapered roller bearings and parts thereof, currently classified under [TSUS] item numbers 680.30 and 680.39." [6] *1987 TRB Order Final Determination,* 52 Fed.Reg. at 30,700.

Commerce is neither obligated to follow nor bound by Customs' classifications, and Commerce may deviate from Customs' classifications in describing merchandise. In this case, however, Commerce chose to use an unqualified tariff classification as the only means of defining the scope of certain merchandise, ostensibly implying that it meant to exclude other existing merchandise.

This Court finds Commerce's tariff reference highly confusing and inappropriate. However, Commerce's failure to employ a disclaimer for tapered roller bearings in its description of the merchandise covered under the 1987 TRB Order is not dispositive of its intent to exclude Koyo's forgings. An antidumping duty order merely constitutes the official notice of the underlying determinations. *See Royal Business Machines,* 1 CIT at 86, 507 F.Supp. at 1012–13. Indeed, in *Royal Business Machines,* the court upheld Commerce's decision, in part, because it had "no doubt that the [subject merchandise] was included in the administrative investigations from their commencement until their conclusion in final determinations." *Id.* at 87, 507 F.Supp. at 1014. In this case, the underlying LTFV and injury investigations, when examined in conjunction with the 1987 TRB Order's absolute language, demonstrate that the order, as a whole, is ambiguous.

**6.** While the HTSUS replaced the TSUS in 1989, a change in tariff classification alone cannot change the intended scope of an antidumping duty order. *Smith Corona,* 915 F.2d at 687.

**7.** It is also important to note that, during the hearing for the LTFV investigation, Koyo's counsel stated that the only "predecessor materials" excluded from Koyo's sales listing were steel coil imports that were not to be used in the manufacture of TRBs. *Anti–Dumping Hearing on: Tapered Roller Bearings From Japan* (Jul. 6, 1987), P.R. Doc. No. 10, Ex. 14, at 117–19, Def.-Int.'s App.

**8.** Koyo recently points to a recent preliminary scope ruling, claiming that the ruling contains language that is relevant to this issue. *See Letter*

In the original LTFV investigation, Koyo responded to Commerce's request for information regarding all imports of unfinished TRB parts by solely reporting the import of two parts that had been only cold forged.[7] *See Response to Department of Commerce's Deficiency Letter Dated February 9, 1987; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from Japan* (Feb. 24, 1987), P.R. Doc. No. 10, Ex. 6, at 17, Def.-Int.'s App. First, the very inclusion of these forgings indicates that Koyo may have considered its forgings within the scope of the investigation. Further, Koyo's failure to report all of its forging imports to the ITA during the LTFV investigation does not establish that the forgings were outside the scope of the order. Indeed, at least one other respondent reported its forging imports in its questionnaire responses. *1995 Koyo Scope Ruling,* 60 Fed.Reg. at 6520. Therefore, because the ITA could not address the inclusion of all Koyo forgings until the matter was brought to the ITA's attention, the language of the LTFV investigation is ambiguous.

Further, in the original injury investigation, Koyo and other respondents argued that unfinished TRB parts, including forgings, should be excluded from the "like product" in the injury investigation. The ITC, however, found that " 'precursor materials' (*i.e.,* unfinished forged rings)" were included within the like product. *Tapered Roller Bearings and Parts Thereof, and Certain Housings Incorporating Tapered Rollers From Japan,* P.R. Doc. No. 10, Ex. 18, at 5–8, Def.-Int.'s App.[8]

*from Powell, Goldstein, Frazer & Murphy to The Honorable Nicholas Tsoucalas* (Jan. 31, 1997). The Court finds that the ruling to which Koyo refers is distinguishable from this case.

In the ruling at issue, an importer requested a scope ruling to ensure that its merchandise, which was classified under TSUS 692.3295, was excluded from the scope of an order. *See Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings and Parts Thereof from Japan and Singapore* (Oct. 6, 1996). Among other items, the original petitioner sought an order to cover wheel hub units. *Id.* at 4. Due to confusion over the scope of the investigation, Commerce stated in a subsequent Product Coverage Memorandum that, absent clear and convincing evidence by the petitioner, wheel hub units were

Consequently, despite the express language of the 1987 TRB Order, there was substantial evidence on the record to conclude that the order was not conclusive as to whether it encompassed Koyo's forgings.

### c. Commerce's Previous Scope Rulings

■ Following its analysis of the 1986 Timken Petition and the 1987 TRB Order, Commerce inspected the available relevant ITC publications, namely its previous scope rulings, the 1981 Scope Clarification and the 1989 ANTN Scope Ruling. *1995 Koyo Scope Ruling*, 60 Fed.Reg. at 6521–22. Commerce concluded that neither of the scope rulings were dispositive of whether Koyo's forgings are within the scope of the 1987 TRB Order. *Id.* Upon review of the relevant scope rulings, the Court finds that this conclusion is supported by substantial evidence on the record.

#### (1) *1981 Scope Clarification*

The language of the 1981 Scope Clarification states, in relevant part:

> The unfinished tapered roller bearings at issue here are cups, cones, and retainers that have been forged and rough machined; that is, turned on a lathe only. They must be further manufactured before they can be sold for use as tapered roller bearings.

46 Fed.Reg. at 40,551. Commerce concluded that the 1981 Scope Clarification was irrelevant to this case because it involved a separate class or kind of merchandise, *i.e.*, TRBs four inches and under in outer diameter. *See 1995 Koyo Scope Ruling*, 60 Fed.Reg. at 6522.

In determining that the 1987 TRB Order does not cover unfinished parts, Koyo contends that Commerce adopted the 1981 Scope Clarification definition, "[parts] that

have been forged and rough machined; that is, turned on a lathe only." Koyo's Mem. Supp. Mot. J. Agency R. at 29 (citing *1981 Scope ·Clarification*, 46 Fed.Reg. at 40,551). Consequently, rings such as Koyo's that have not been turned are not unfinished parts. *Id.* Koyo claims that, even though the 1981 Scope Clarification was made in the context of the 1976 TRB Finding, it is relevant to the issue here because it addressed the same product and manufacturing processes and involved the same parties as the present case. *Id.* at 29. In fact, Koyo argues, the purpose of Timken's 1986 petition was to respond to Commerce's determination in the 1981 Scope Clarification that the 1976 TRB Finding did not cover unfinished parts of TRBs. *Id.* at 29.

Moreover, Koyo argues that Commerce's position that the 1981 Scope Clarification is irrelevant to the present case because it involved "a separate class or kind of merchandise" and is contradicted by Commerce's own previous determinations and statements in this case. *Id.* at 29–30. In support of its position, Koyo points out that, in 1991, Commerce combined the administrative reviews of the 1976 TRB Finding and the 1987 TRB Order because they were "historically similar," they contained "essentially the same subject merchandise," and the "principal disparity between the reviews [was] the schedule." *Id.* (citing *Memorandum from Joseph A. Spetrini on Scheduling of Concurrent Reviews of Tapered Roller Bearings (TRBs) Under Four Inches (A–588–054) and Over Four Inches (A–588–604), From Japan to Eric I. Garfinkel* 1 ("*1991 Spetrini Memorandum*") (Jul. 18, 1991), Pls.' App., Ex. 5).

Commerce requests that the Court strike the 1991 Spetrini Memorandum because it is not part of the administrative record. Def.'s Opp'n to Mot. J. Agency R. at 17 n.7. Koyo

the only TSUS 692.3295 merchandise subject to investigation. *Id.* at 4–5. Petitioner failed to present such evidence. Hence, in the preliminary scope ruling, Commerce noted that *"in this case*, we find no basis on which to depart from the [written description of the scope of the order]," *id.* at 6 (emphasis added), which clearly excluded the importer's merchandise.

In this case, there is ample reason to depart from Commerce's absolute tariff classification

reference. While Commerce's TSUS references are confusing, unlike the case discussed above Commerce did not clarify the scope of the investigation through a memorandum or other medium in a way that explicitly excluded Koyo's forgings from the scope of the investigations. Consequently, unlike the situation discussed above, ambiguity exists in this case.

counters that it does not seek to supplement the administrative record but, rather, cites to the memorandum for the limited purpose of rebutting Commerce's argument that the proceedings under the 1976 TRB Finding are irrelevant to the proceedings under the 1987 TRB Order. Koyo's Reply Mem. Supp. Mot. J. Agency R. at 12 n.3.

 Commerce's motion to strike the 1991 Spetrini Memorandum is denied. A motion to strike under USCIT Rule 12(f) "constitutes an extraordinary remedy, and should be granted only in cases where there has been a flagrant disregard of the Rules of this Court." *Fujitsu General, Ltd. v. United States,* 15 CIT 432, 433, 1991 WL 164482 (1991) (citation omitted). Legal arguments and facts presented by the parties must be supported by information in the administrative record.[9] *See Calabrian Corp. v. U.S. Int'l Trade Comm'n,* 15 CIT 287, 288, 1991 WL 117824 (1991). However, while documentary items not presented to or obtained by Commerce are outside the administrative record, a party "is free to offer whatever *legal* arguments it chooses." *Sachs Auto. Prods. Co. v. United States,* 17 CIT 740, 741, 1993 WL 276730 (1993). The 1991 Spetrini Memorandum is an internal Commerce memorandum regarding the scheduling of concurrent reviews for tapered roller bearings under and over four inches in the interest of administrative efficiency. Koyo cited to the memorandum to support its legal argument rebutting Commerce's 1995 Koyo Scope Ruling position, as stated in the administrative record. Consequently, Koyo is not supplementing the administrative record, but supporting its legal argument by citing to a document demonstrating Commerce's allegedly inconsistent behavior and rebutting Commerce's contention.

Koyo claims that the 1991 Spetrini Memorandum demonstrates that the 1981 Scope Clarification is relevant because Commerce admitted that the 1976 TRB Finding and

1987 TRB Order are not separate, but related. Koyo's Mem. Supp. Mot. J. Agency R. at 31–32. Hence, Koyo contends that Commerce cannot rely on the court's decision in *American NTN,* 14 CIT at 328, 739 F.Supp. at 1562, which noted that the separate, unrelated *antifriction* bearing antidumping investigations were irrelevant to the scope of the 1987 TRB Order addressing tapered roller bearings.

Commerce responds that the 1981 Scope Clarification did not provide a definition of unfinished parts that would be relevant to the 1986 Timken Petition or the 1987 TRB Order but, rather, it simply provided a description of the type of TRBs not covered by the 1976 TRB Finding. Def.'s Opp'n to Mot. J. Agency R. at 16.

Timken claims that since the 1981 Scope Clarification, which dealt with the applicability of the 1976 TRB Finding, did not address the difference between finished and unfinished parts, it cannot be controlling over the 1986 Timken Petition and subsequent investigation. Timken's Opp'n to Mot. J. Agency. R. at 22. In particular, even if the 1981 Scope Clarification defined unfinished parts, Timken contends that it is not relevant to the present case because there is no evidence that the 1986 Timken Petition or the 1986–87 investigations adopted the definition in the 1981 Scope Clarification. *Id.* at 23.

The 1981 Scope Clarification is not dispositive of whether Koyo's forgings are within the scope of the 1987 TRB Order. As this Court stated with respect to the 1986 Timken Petition, the 1981 Scope Clarification describes the type of unfinished parts not covered by the 1976 TRB Finding; it does not define unfinished parts. Indeed, the plain language of the 1981 Scope Clarification states: "[t]he unfinished tapered roller bearings *at issue here* are ..." 46 Fed.Reg. at 40,551 (emphasis added). Hence, it does not preclude the possibility of parts that have not

---

**9.** The Court's review of a final determination is limited to a review of the administrative record. 19 U.S.C. § 1516a(b)(2)(B) (1994); *see also Win-Tex Prods., Inc. v. United States,* 17 CIT 786, 788, 829 F.Supp. 1349, 1351 (1993); *Neuweg Fertigung GmbH v. United States,* 16 CIT 724, 726, 797 F.Supp. 1020, 1022 (1992). The administra-

tive record "is limited to the information that was presented to or obtained by the agency making the determination during the particular review proceeding for which section 1516 authorizes judicial review." *Neuweg Fertigung,* 16 CIT at 726, 797 F.Supp. at 1022 (citation omitted).

been green machined from being considered unfinished parts.

Further, the 1991 Spetrini Memorandum merely indicates that the administrative reviews for the 1976 TRB Finding and 1987 TRB Order were scheduled concurrently for the sake of efficiency, and does not automatically prove that the 1981 Scope Clarification is relevant to this case.

Consequently, there is sufficient evidence on the record to support Commerce's conclusion that the 1981 Scope Clarification does not provide a definition of unfinished parts that is relevant to the 1986 Timken Petition or the 1987 TRB Order.

### (2) *The 1989 ANTN Ruling*

The language of the 1989 ANTN Scope Ruling states, in relevant part:

> Though the ITC final determination states that a component that has been both green turned and heat treated is within the scope of the order there is no clear indication whether or not a green turned ring that has not been hardened with heat treatment is also within the scope.

*1989 ANTN Scope Ruling*, at 3. In the 1989 ANTN Scope Ruling, Commerce stated that there are four stages in the production of tapered roller bearings: (1) green machining, or "turning"; (2) heat treating; (3) finishing, including grinding and polishing/honing; and (4) assembling. *Id.* Commerce concluded that since ANTN's imports had been green machined prior to importation, they had completed the first stage in the production of a roller bearing, and so, were unfinished parts. *Id.* at 4. Subsequently, Commerce found, and the court affirmed, that ANTN's imports were within the scope of the 1987 TRB Order. *See id.; American NTN*, 14 CIT at 333, 739 F.Supp. at 1566.

In the 1995 Koyo Scope Ruling, Commerce concluded that the 1989 ANTN Scope Ruling dealt exclusively with articles that had been green machined, and so, took no position with respect to nonmachined forgings. 60 Fed. Reg. at 6522. Commerce further noted that Koyo's forging production process is different than that of ANTN's, *see also United States Court of International Trade Hearing*

(May 1, 1996), at 25–30, and provided Koyo's forgings with "some of the shape that green-machining might otherwise give." 60 Fed. Reg. at 6522.

Koyo contends that since green machining is the first step in manufacturing TRBs and Koyo's forged rings have not been green machined, they must be considered precursor materials or raw materials (as opposed to unfinished parts) that are outside the scope of the 1987 TRB Order. Koyo's Mem. Supp. Mot. J. Agency R. at 34; *see also United States Court of International Trade Hearing*, at 5–20. Because Commerce and Timken knew that Koyo was importing forgings that have not been green machined, Koyo claims they could have concluded that forging, not green machining, is the first stage in the production of TRBs. Koyo's Mem. Supp. Mot. J. Agency R. at 21.

Koyo further alleges that the 1989 ANTN Scope Ruling is consistent with the 1981 Scope Clarification, since both rulings determined that an article that has not been green machined is not an unfinished part, and that the 1989 ANTN Scope Ruling is probative of the scope of the 1987 TRB Order, since it was requested one year after the 1987 TRB Order. *Id.* at 36.

Commerce responds that the 1989 ANTN Scope Ruling is not dispositive of whether Koyo's forged rings are within the 1987 TRB Order because the 1989 ANTN Scope Ruling did not involve a determination of what constitutes a TRB part. Def.'s Opp'n to Mot. J. Agency R. at 16–18. The 1989 ANTN Scope Ruling simply found that green turned rings are unfinished parts. *Id.* at 16–17. Hence, Commerce argues that because materials at an earlier stage of the manufacturing process were not considered in the 1989 ANTN Scope Ruling, the ruling cannot be applied to the issue of whether forged rings are within the scope of the 1987 TRB Order. *Id.* at 18.

Timken agrees with Commerce that the 1989 ANTN Scope Ruling does not require an article to be green machined before it can be considered a TRB part since the ruling does not define or describe the green machining process. Timken's Opp'n to Mot. J. Agency R. at 23–24. Indeed, Timken notes that the court in *American NTN* relied upon

the *Diversified Products* criteria, not the green machining process, in determining whether ANTN's rings were unfinished parts. *Id.* at 24. Therefore, the court did not hold that the first step in manufacturing TRBs is green machining because the court did not rely upon the stage of manufacturing in determining the scope of the 1987 TRB Order. *Id.* at 25.

Timken further emphasizes that Commerce was not required to consider the 1989 ANTN Scope Ruling in determining whether to utilize the *Diversified Products* criteria, but only the 1986 Timken Petition, the underlying investigations, and the 1987 TRB Order. *Id.* at 25–26 (citing *Smith Corona,* 915 F.2d at 685). In fact, even if the 1989 ANTN Scope Ruling were relevant, Timken argues that it would not preclude Commerce from using the *Diversified Products* analysis. *Id.* at 26.

The 1989 ANTN Scope Ruling is not dispositive of whether Koyo's forged rings are within the scope of the 1987 TRB Order. First, the plain language of the 1989 ANTN Scope Ruling does not preclude the possibility that forged rings can be considered unfinished parts even though they have not been green machined. The ruling states that the "general physical characteristics of a green turned ring are similar to an unfinished part in that a green turned ring . . . has undergone . . . the first stage in the production of a tapered roller bearing." *1989 ANTN Scope Ruling,* at 3. The Court finds Commerce's statement that green machining constitutes the first stage in the production of a tapered roller bearing problematic and confusing. This is especially true since no evidence was presented that Koyo's forging production process differs significantly from that of ANTN. However, there is no discussion in the 1989 ANTN Scope Ruling concerning the limits or the definition of an unfinished part and the ruling does not suggest that merchandise must be heat treated to be considered an unfinished part.

Furthermore, the court in *American NTN* did not support the proposition that green machining is the first step in the manufacture of TRBs. The court merely stated that it supported the ITA's finding that, under the *Diversified Products* analysis, the physical characteristics of a green turned ring are similar to those of an unfinished part.

Consequently, Commerce's conclusion that the 1989 ANTN Scope Ruling is not dispositive of whether Koyo's forged rings are within the scope of the 1987 TRB Order is supported by substantial evidence on the record.

Commerce's determination that the 1986 Timken Petition, 1987 TRB Order, the underlying LTFV and injury investigations and the relevant previous scope determinations are ambiguous with respect to whether Koyo's forgings are within the scope of the 1987 TRB Order is supported by substantial evidence on the record. Therefore, Commerce properly resorted to the *Diversified Products* criteria.

2. *Commerce's Application of the Diversified Products Analysis*

 The *Diversified Products* criteria are as follows: (1) general physical characteristics of the merchandise; (2) expectations of the ultimate purchaser; (3) the channels of trade; and (4) the ultimate use of the merchandise. 6 CIT at 162, 572 F.Supp. at 889; *Koyo Seiko,* 17 CIT at 1079, 834 F.Supp. at 1404. In the 1995 Koyo Scope Ruling, Commerce employed the *Diversified Products* criteria and concluded that Koyo's forgings were within the 1987 TRB Order. *See* 60 Fed.Reg. 6523.

Koyo fails to challenge Commerce's conclusion concerning the *Diversified Products* criteria other than the physical characteristics criterion. The Court concludes on evidence presented in the record that Koyo's forgings have similar expectations of the ultimate purchasers, flow through similar channels of trade and have similar ultimate use to unfinished part merchandise encompassed by the 1987 TRB Order. Consequently, the only issue that remains to be decided is whether Koyo's forgings display similar physical characteristics as the unfinished parts under the 1987 TRB Order.

Koyo contends that in applying the *Diversified Products* criteria, Commerce should have concluded that unmachined forgings are not unfinished parts of TRBs. Koyo's Mem.

Supp. Mot. J. Agency R. at 40–45. Koyo asserts that the most important factor of the *Diversified Products* analysis is whether its forgings share the physical characteristics of goods that are accepted as being within the scope of the 1987 TRB Order. Koyo's Mem. Supp. Mot. J. Agency R. at 40–41. Hence, Koyo contends that the proper comparison should be between Koyo's forgings and the least-developed merchandise within the scope of the 1987 TRB Order, *i.e.*, green turned rings not yet heat treated. *Id.* at 44; Koyo's Reply Mem. Supp. Mot. J. Agency R. at 32 (citing *American NTN*, 14 CIT at 332, 739 F.Supp. at 1565–66).

It follows, Koyo contends, that since its forgings lose 24–30 percent of their mass when they are green machined and before they are heat treated, they are "physically distinct" from green turned rings. Koyo's Mem. Supp. Mot. J. Agency R. at 41–42. Hence, when applying the *Diversified Products* analysis, its forgings are not unfinished parts of TRBs and, thus, are not within the scope of the 1987 TRB Order. *Id.* at 45.

Commerce asserts that it has discretion in how to balance the various criteria in a *Diversified Products* analysis. Def.'s Opp'n to Mot. J. Agency R. at 19. Commerce argues that the proper inquiry is whether Koyo's forgings have similar physical characteristics to the products subject to the 1987 TRB Order, not whether Koyo's forgings share the physical characteristics of green turned rings. *Id.* at 20. Indeed, Commerce contends that materials that have not been green machined may constitute a part of a TRB. *Id.* at 21.

Additionally, Commerce claims that a material, in the context of the 1987 TRB Order, is either raw material or a TRB part. *Id.* at 21 (citing *American NTN*, 14 CIT at 325, 739 F.Supp. at 1560). Commerce argues that Koyo's forgings must be considered TRB parts since, like green turned rings, they have undergone significant processing before importation. *Id.* at 21.

Timken contends that, with respect to physical characteristics, Koyo's forgings are too advanced to be considered raw material since they are close to the final dimensions of green rings, *i.e.*, they are "near net shape."

Timken's Opp'n to Mot. J. Agency R. at 31–32.

As a preliminary matter, it is well settled that Commerce has discretion in how to balance the *Diversified Products* criteria. *See, e.g., Smith Corona v. United States*, 12 CIT 854, 869, 698 F.Supp. 240, 253 (1988). Further, the fact that Koyo's forgings have not been green machined does not necessarily distinguish them from unfinished parts. While Koyo's forgings lose 24–30 percent of their mass when green machined, this does not place them in a different class or kind of merchandise than that described in the 1987 TRB Order. Indeed, Koyo's argument is a variation of the "substantial transformation" argument rejected by the court in *American NTN*. The plaintiffs in *American NTN* argued that heat treatment effects a "substantial transformation" on green turned rings, and so, green turned rings which have not been heat treated have different physical characteristics than unfinished parts. 14 CIT at 332, 739 F.Supp. at 1565. However, the court concluded that, in antidumping scope determinations, the substantial transformation argument has little legal significance. *Id.*

Further, the court in *American NTN* stated that, as a matter of logic, if a TRB part is neither finished nor unfinished it must be a raw material or scrap metal. *Id.* at 325, 739 F.Supp. at 1560. Here, Koyo's forgings have been processed and refined to the point where they can no longer be considered scrap metal. They have undergone significant processing and are close to their ultimate size and shape. *See Orvos Affidavit*, P.R. Doc. No. 10, Ex. 19, at 2, Def.-Int.'s App. The shape of Koyo's forgings is closer to a part than to raw material, even though the forgings lose 24–30 percent of their mass after being green machined, since a forging cone's inner bore and cup's inner race are within +/− 2/100ths of an inch of the final shape after hot forging. *Slicker Affidavit*, P.R. Doc. No. 34, Ex. 4, at 2–3, Def.-Int's App. Further, the overall shape of the forging is so advanced that any use other than as a TRB part is unlikely. *Orvos Affidavit*, at 2; *see also United States Court of International Trade Hearing*, at 22 (Koyo admitted

that the forgings at issue are solely dedicated to use for the production of TRBs and, to a lesser extent, antifriction bearings). Hence, Commerce's finding that the physical characteristics of Koyo's forgings are similar to unfinished parts is supported by substantial evidence in the record and was otherwise in accordance with law.

### 3. *Retroactivity of Commerce's 1995 Koyo Scope Ruling*

■■■ Koyo argues that the 1995 Koyo Scope Ruling should only be applied prospectively. Koyo's Mem. Supp. Mot. J. Agency R. at 47. According to Koyo, retroactive application of the 1995 Koyo Scope Ruling will be prejudicial to Koyo, since it relied upon Commerce's prior determinations on unfinished parts. *Id.* (citing *IPSCO, Inc. v. United States*, 12 CIT 359, 687 F.Supp. 614, *reh'g denied*, 12 CIT 953, 697 F.Supp. 1222 (1988)).

Commerce seeks a remand to explain its decision to apply the 1995 Koyo Scope Ruling to pending and future reviews and requests that the court defer ruling on this issue until Commerce reports the results of the remand proceedings. Def.'s Opp'n to Mot. J. Agency R. at 24.

Timken argues that the 1995 Koyo Scope Ruling does not change the 1987 TRB Order, and so, the 1995 Koyo Scope Ruling should be applied to all entries subject to the 1987 TRB Order. Timken's Opp'n to Mot. J. Agency R. at 38.

In *Timken Co. v. United States*, 20 CIT ——, ——, 937 F.Supp. 953, 956 (1996), the Court addressed this same issue and ordered a remand for Commerce "to articulate a specific rationale for its decision to apply the [1995 Koyo Scope Ruling] to only pending and future reviews." Furthermore, the Court stated that if Commerce is unable to present a reason for its decision, it must revise the 1995 Koyo Scope Ruling and commence administrative review proceedings "in order to apply the scope determination to all importations of merchandise covered by the antidumping order that have entered the United States subsequent to the suspension of liquidation and that have not previously

been included in administrative reviews." *Id.* Therefore, in accordance with *Timken,* this case is remanded to Commerce to explain a rationale for its decision to apply the 1995 Koyo Scope Ruling only to pending and future reviews.

### Conclusion

Commerce's decision to use, and application of, the *Diversified Products* analysis was supported by substantial evidence on the record and fully in accordance with law. Consequently, Commerce properly found that Koyo's forgings are within the scope of the 1987 TRB Order. This case is remanded for Commerce to explain a rationale for its decision to apply the 1995 Koyo Scope Ruling only to pending and future reviews.

### ORDER

This case having been duly submitted for a decision and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

ORDERED that this case is remanded to the Department of Commerce, International Trade Administration ("Commerce"), to explain a rationale for its decision to apply the *Final Affirmative Determination in Scope Inquiry on Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof From Japan,* 60 Fed.Reg. 6519 (Feb. 2, 1995) to only pending and future reviews; and it is further

ORDERED that the remand results are due within ninety (90) days of the date that this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days of the date that the responses or comments are due.